**TOPPS CHEWING GUM,
INC., Plaintiff,**

v.

**MAJOR LEAGUE BASEBALL
PLAYERS ASSOCIATION,
Defendant.**

No. 85 Civ. 2669 (WCC).

United States District Court,
S.D. New York.

Aug. 1, 1986.

Shea & Gould, New York City, for plaintiff; Daniel L. Carroll, Yee Wah Chin, George G. Nelson, of counsel.

McGuire & Tiernan, New York City, for defendant; Harold F. McGuire, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This case concerns the commercial currency of youth: baseball trading cards, those familiar 2½ inch by 3½ inch cards with the name and picture of a major league baseball player on the front, and his career statistics and personal information on the back. Plaintiff, Topps Chewing Gum, Inc. ("Topps"), is the major manufacturer and marketer of such cards and other products containing pictures of major league baseball players. Its products are sold either alone or in combination with bubble gum pursuant to license agreements between Topps and individual baseball players. Defendant, the Major League Baseball Players Association ("the MLBPA" or "the Players Association"), is a labor organization that represents major league baseball players. The MLBPA has encouraged players not to renew their license agreements with Topps, but instead to transfer their publicity rights to the MLBPA so that it can negotiate license agreements with Topps and other baseball product manufacturers on behalf of all major league players.

Topps alleges that the MLBPA has thereby instigated a group boycott in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and has combined to monopolize major league baseball players' publicity rights in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1982). Topps further alleges that the MLBPA has tortiously interfered with Topps' contractual relationships with major league baseball players.

This matter is now before the Court on a variety of motions. Topps has moved for partial summary judgment on the ground that the MLBPA's actions constitute *per se* violations of the antitrust laws. The MLBPA has cross-moved for summary judgment on the ground that Topps has failed to make out an antitrust violation. Finally, Topps has moved for a mandatory preliminary injunction directing the MLBPA to license to Topps those rights Topps currently holds under contracts with individual players that will expire on December 31, 1986.

For the reasons set forth below, Topps' motion for partial summary judgment, and the MLBPA's cross-motion for summary judgment are denied. Topps' motion for a preliminary injunction is also denied.

*Background*

The parties are in agreement with respect to the following facts:

*Topps' Licensing Program and Player Contracts*

For more than 20 years, Topps has been the dominant manufacturer and marketer of baseball trading cards. Over the years, Topps has developed and implemented an extensive program of signing individual contracts with thousands of minor and major league baseball players. It currently has contracts in force with all but a handful of the active major league players. Under these contracts, a player grants Topps an exclusive right to publish the player's name, picture, signature, and biographical information on products "to be sold either alone or in combination with chewing gum, candy and confection, or any of them." Exhibit 3 to Affidavit of Daniel L. Carroll, Esq. in Support of Plaintiff's Motion for Partial Summary Judgment [hereinafter cited as "Carroll Aff."]. The contracts are standardized form agreements, and a player either accepts the contract or rejects it. Topps does not negotiate the terms of the contracts on a player-by-player basis.

Topps typically solicits ballplayers to enter into these contracts while they are in the minor leagues. However, the term of the contract is five years, beginning, in effect, when the player reaches the major leagues. Thus, the contracts often have a duration of more than ten years: a player's entire minor-league career plus his first five major league seasons. Moreover, it has been Topps' practice to attempt to obtain extensions of the contracts for two-year intervals so that each player is always

under contract for five major league baseball seasons in advance.

The compensation terms of the contracts have remained unchanged since 1975. A player receives $5 when he signs his initial contract. For every season in which he is a member of a major league club or in which Topps uses his picture, a player receives an advance of $250 against his pro rata share of a royalty pool computed at 8% of Topps' first $4 million in net sales, and 10% of Topps' net sales in excess of $4 million. Pursuant to an agreement made with the MLBPA in 1968, Topps pays any royalties owing to major league players to the MLBPA for distribution in accordance with the MLBPA's standard procedure for distributing license revenue.

Topps contends that its ability to obtain player contracts and extensions is crucial to its success. The contracts "constitute the carefully developed mechanism whereby Topps is able to produce and market series and sets of baseball cards and related products featuring the pictures and playing records of established major league baseball players." Affidavit of Joel Shorin in Support of Plaintiff's Motion for Partial Summary Judgment ¶ 13. In order to assure its continued ability to obtain such contracts, Topps has included in the contracts a provision that prohibits players during the life of their contracts from granting a competing license. The provision provides that the player

> shall not during the term of this Agreement or any extension or renewal thereof, enter into any agreements with others with reference to, or involving the subject or the rights granted herein, nor ... grant to others the rights granted to Topps hereunder, or any rights similar thereto, whether such grant of rights to others be for the term of this contract or any part thereof, or whether they be for a time commencing after the expiration of this contract.

Exhibit 3 to Carroll Aff. The scope of these contracts, Topps' practice in procuring them, and the restriction against competing grants have been repeatedly upheld against attacks in previous litigation. *See, e.g., Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Topps Chewing Gum, Inc.,* 67 F.T.C. 744 (1965).

### The MLBPA's Involvement in Licensing Players' Rights

In 1966, the MLBPA began to license the publicity rights of its members for use on a group basis as one of its activities. The MLBPA derives its ability to license baseball players' publicity rights from so-called Commercial Authorization Agreements signed by every major league baseball player. *See* Exhibit 10 to Carroll Aff. In those agreements, each player grants to the MLBPA the exclusive right to use his picture, name, and signature with other players on a group basis for a term of three years. *See* Exhibit 29 to Carroll Aff. However, since players do not sign Commercial Authorization Agreements until they enter the major leagues, those agreements do not cover rights that players have previously granted to Topps.

In the early 1980's, the MLBPA began to grant licenses for player picture products that compete directly with those marketed by Topps. The MLBPA could not give Topps' would-be competitors the right to sell players' pictures "alone" or "in combination with chewing gum, candy and confection"—Topps had already obtained exclusive assignments of those rights from individual players. The MLBPA could, however, sublicense to others the right to sell players' pictures in conjunction with various companion products it calls "premiums." Thus, the Players Association has licensed the Fleer Corporation to sell trading cards, stamps, stickers, and decals in combination with major league team logo stickers, the Leaf-Donruss Company to sell trading cards, stamps, stickers, and decals in combination with puzzle pieces which when assembled make a jigsaw puzzle of a Hall of Fame player, and the Optigraphics Corporation to sell lenticular action cards in combination with baseball trivia cards. There is some disagreement as to whether

these companies pay higher royalties for their rights than Topps pays for its rights.

*The Relationship between Topps and the MLBPA*

For many years, the MLBPA has attempted to persuade Topps to pay more for its rights, but Topps has refused. In 1966, Marvin Miller, then executive director of the MLBPA, met with Joel Shorin, president of Topps, to discuss the terms of Topps' individual contracts with the MLBPA's members. Topps had no contractual relationship with the MLBPA, but Miller was concerned that Topps was not paying players enough for the rights it was receiving from them. At that time, Topps paid each player $5 when he signed the initial contract, and $125 for each season in which he was a member of a major league club or in which Topps used his picture. Topps paid no royalties.

Miller argued that these terms were unfair, but Topps refused to modify them. In 1968, Miller reported his difficulties to the executive board of the MLBPA, and the board voted to recommend that MLBPA members cease renewing their individual contracts with Topps. The recommendation was accepted and very few players signed renewals with Topps.

Thereafter, Miller and Shorin met again in an attempt to negotiate a solution to their differences. Miller demanded a uniform expiration date for all of Topps' contracts, an agreement that the MLBPA could at some point offer the rights held by Topps on a bid basis, a limitation on Topps' rights to sell baseball cards alone, and more money for the players. By late 1968, Topps and the MLBPA reached an agreement. Topps agreed to pay increased compensation to the players, including royalties, but did not accede to the MLBPA's demands for a uniform expiration date and the opportunity to offer the rights held by Topps on a bid basis. As mentioned above, Topps subsequently agreed to pay royalties owing to players under the individual player contracts to the MLBPA for distribution in accordance with its standard procedure for distributing license revenue.

In 1973, Topps and the MLBPA extended the 1968 agreement for an additional five years so that it did not expire until 1981. However, beginning in late 1981, Miller renewed his attempts to obtain the concessions he was unable to win in 1968. Again, Topps rebuffed these demands.

In December 1981, at a meeting of the MLBPA executive board, Miller reviewed the status of the relationship between the MLBPA and Topps. Among other things, Miller noted that since 1968 Topps had paid royalties to the Players Association, but that in negotiations for an extension of that agreement, "Topps had, thus far, offered a lesser royalty for exclusive rights to trading cards than had been negotiated with Fleer and Donruss for non-exclusive rights." Excerpts from Minutes of Executive Board Meeting on December 7–10, 1981, Exhibit 21 to Carroll Aff. The board's discussion culminated in a vote "that pending the results of further negotiations with Topps it's [sic] recommendation is that no player enter into or renew an agreement with Topps. Miller was directed by the Board to report on further developments in Spring Training." *Id.*

According to Miller, the MLBPA believed that Topps' individual contracting system left the MLBPA with "no bargaining power," Miller Dep. Tr. at 137, Exhibit 6 to Carroll Aff., and that the "practical result" of the recommendation that players not sign with Topps—if it resulted in the expiration of the individual contracts—was that there would "be central negotiation" conducted by the MLBPA, *id.* at 164–65.

According to Dan Quisenberry, a player who has been actively involved in MLBPA activities throughout his career and who, as the player representative for the Kansas City Royals, attended MLBPA board meetings for the past three years, one of the reasons for the recommendation that players not sign agreements or extensions with Topps was to permit the MLBPA to be in a position to negotiate with all potential licensees without having to worry about Topps' individual contracts. Quisenberry Dep. Tr. at 26, 45, Exhibit 16 to Carroll Aff. Anoth-

er player, Buck Martinez, testified that he was informed:

> That the Players Association—we were attempting to negotiate a new contract with the Topps company and that we felt that there was a need to have an open competition, and that the bidding detect and settle whatever it may, and the fact that we simply wanted to negotiate a new contract with Topps.
>
> Q. When you say "we" you are referring to the Players Association?
>
> A. Yes.

Martinez Dep. Tr. at 11–12, Exhibit 14 to Carroll Aff.

The executive board of the MLBPA immediately undertook to execute its recommendation. On January 20, 1986, Miller and Donald M. Fehr, then general counsel to the MLBPA, distributed a memorandum to all major league baseball players. Miller and Fehr purported to summarize the status of the negotiations between the Players Association and Topps concerning royalties, and concluded:

> *Given the foregoing, the Executive Board has determined that it cannot, and will not recommend that any player enter into a new agreement with Topps, or renew or extend any existing agreement with Topps, pending the outcome of the discussions between the Association and Topps.* As noted above, the current Topps-player contracts do not provide for the payment of competitive royalty rates and are otherwise in need of improvement. *Accordingly, the Board strongly urges that no player enter into a new agreement with Topps, or renew or extend any existing agreement with Topps.* To do so would, in effect, undermine the ability of the Players Association to negotiate on behalf of all players as a group, and thereby inhibit our ability to provide for increased competition in the trading card market. Moreover, our ability to negotiate an appropriate agreement with Topps (and any other individual or company interested in group rights) is retarded when players

enter into individual agreements for such companies for group licenses.

> The foundation of the Association's group licensing program, and the millions of dollars in revenue it now produces and can be expected to produce in the future rests upon the Association's right and ability to negotiate on behalf of all players as a group. *Thus, we urge that each player abide by the Executive Board's recommendation.* This will not adversely affect the revenue currently received by players, since Topps obligations to pay royalties under its existing contracts extend for several years into the future.

Exhibit 17 to Carroll Aff. (emphasis in original).

Moreover, during the annual spring training meetings held with each major league club, Miller and his staff reiterated to all the players the executive board's recommendation that they not sign with Topps. Miller Dep. Tr. at 121–22, 132–33, Exhibit 6 to Carroll Aff. Memoranda sent during the season by the MLBPA reminded players that the executive board "strongly urges that no player enter into a new agreement or renew or extend any existing agreement with Topps." Exhibits 18, 19 to Carroll Aff.

In addition to these actions, in 1982, after deciding to recommend to its members that they not sign any contracts or extensions with Topps, the MLBPA modified the Commercial Authorization Agreements players sign to transfer their publicity rights to the MLBPA. Under a new provision, each player convenants

> that he will not individually extend, renew or modify any existing agreement involving the commercial use of his name, signature, playing record or likeness in a group with three or more players, and hereby appoints the MLBPA to act as his exclusive agent in connection with negotiations for any such proposed extension, renewal or modification.

Exhibit 28 to Carroll Aff. The stated purpose of this change was to "expressly enhance [the MLBPA's] ability to negotiate a

new agreement with Topps and others." Exhibit 17 to Carroll Aff.

This added "non-renewal" clause would appear to be designed to bar MLBPA members from granting their publicity rights for use on a group basis to any other person or entity, including Topps. Indeed, Miller was quite explicit on this point in a memorandum he sent to all MLBPA members in July 1982, shortly after the change was made:

> Almost all Players have contracts with Topps Chewing Gum, Inc. for trading cards with gum and confectionary products. As was stated in the January 20 Memorandum the Executive Board has determined that it cannot and will not recommend that any player enter into a new agreement with Topps, or renew or extend any existing agreement with Topps. The Board strongly urges that no player enter into a new agreement, or renew or extend any existing agreement with Topps. *You will recall also that the Board authorized amending the Commercial Authorization Agreement. As a result the Players Association has been appointed to act as the exclusive agent for each player in connection with negotiations for any such proposed extension, renewal or modification.*

Exhibit 18 to Carroll Aff. at 2 (emphasis added). Although the "exclusivity" clause in Topps' player contracts protects Topps for the duration of the contracts and extensions previously obtained, the "exclusivity" and "non-renewal" clauses of the Commercial Authorization Agreements would on their face foreclose Topps from contracting with individual major league players for publicity rights for use on a group basis in the event of any lapse in the player contracts.

Little has changed in the past few years. The recommendation that players not sign with Topps has been adopted at each subsequent MLBPA executive board meeting. In addition, the MLBPA has repeatedly reminded its membership of the recommendation. *See* Exhibits 24, 25, 27 to Carroll Aff.

As a result, few players have signed renewals with Topps.

On December 31, 1986, Topps' player contracts with approximately 100 major league baseball players will expire. Since these are players who have been in the major leagues for at least five years, Topps contends that they tend to the better known "superstars" of the sport. Upon expiration of these contracts, Topps will be unable to produce a complete set of baseball trading cards unless it acquires these 100 players' publicity rights from the MLBPA.

As noted above, Topps alleges that the MLBPA's actions constitute a group boycott in violation of section 1 of the Sherman Act, and a combination or conspiracy to monopolize major league baseball players' publicity rights in violation of section 2 of the Sherman Act. Topps also contends that it will suffer irreparable harm when its player contracts with 100 veteran players expire at the end of this year, and requests that the Court issue a mandatory preliminary injunction to prevent that harm. I turn first to a discussion of the antitrust issues, and then to Topps' motion for a preliminary injunction.

*Discussion*

### A. Topps' Group Boycott Claim

Section 1 of the Sherman Act literally proscribes "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 (1982). However, as Justice Brandeis noted in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918), all commercial agreements, by their very nature, restrain trade in some sense. "To bind, to restrain, is of their very essence." *Id.* Thus, the Supreme Court has applied a judicial gloss to the statute and has held that an agreement violates section 1 only if it is an *unreasonable* restraint of trade. *Id.* In most cases a flexible "rule of reason" analysis guides the inquiry as to whether a particular agreement is reasonable or not. *See Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). But an arrangement will be

held a *per se* violation if it falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). "This *per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive. Courts can thereby avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry entails." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, ——, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (quoting *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343–344, 102 S.Ct. 2466, 2472–2473, 73 L.Ed.2d 48 (1982)).

The Supreme Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they fall within the category of *per se* violations of section 1. *See, e.g., United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Topps contends that the MLBPA has instigated such a group boycott and has therefore committed a *per se* violation of the Sherman Act.

However, while group boycotts are often listed among the categories of economic arrangements that merit *per se* invalidation

under section 1, "[e]xactly what types of activity fall within the forbidden category is ... far from certain." *Northwest Wholesale Stationers, Inc.*, 105 S.Ct. at 2619. As Professor Sullivan has stated, "there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." L. Sullivan, *Handbook of the Law of Antitrust* 229–30 (1977). Accordingly, the task of determining whether certain concerted activity is *per se* illegal is not always an easy one.

In *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir.1978), the Court of Appeals for the District of Columbia Circuit provided helpful instruction on this difficult question. The court stated:

The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. *In each instance, however, the hallmark of the "group boycott" is the effort of competitors to "barricade themselves from competition at their own level." It is this purpose to exclude competition that has characterized the Supreme Court's decisions invoking the group boycott per se rule.*

*Id.* at 1178 (footnotes omitted) (emphasis added) (quoting L. Sullivan, *supra*, at 245).

An examination of the leading Supreme Court cases bears out the court's analysis. For example, in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the Supreme Court

found the *per se* rule applicable where some retail dealers of General Motors automobiles agreed with each other and with General Motors not to sell cars to competing discount dealers. The Court found that "[w]hat resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market." *Id.* at 144, 86 S.Ct. at 1330. Similarly, in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the Court used the *per se* rule where a large retail seller of appliances induced manufacturers and distributors of such products not to sell to a competing retailer. The Court stated that the alleged combination took from the plaintiff "its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products." *Id.* at 213, 79 S.Ct. at 710. Finally, in *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the Court applied the *per se* rule where certain manufacturers of clothing agreed with each other not to sell their products to retailers who also purchased garments made by competing "design pirate" manufacturers. The Court stated that this combination was an attempt to exclude from the industry those manufacturers and distributors who did not conform to the rules established by the defendants. *Id.* at 466, 61 S.Ct. at 707.

■ The instant case differs from these classic cases in a number of important respects. First, as the court noted in *Smith*, 593 F.2d at 1178, and as Professor Sullivan stresses in his treatise, L. Sullivan, *supra* p. 17, at 232, in most of these cases the parties to the agreement were competitors of each other. This is a critical element. The *per se* rule is not applicable to boycotts that do not involve agreements among competitors. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.) (en banc) ("It is important to distinguish between 'horizontal' restraints, *i.e.* agreements *between competitors* and 'vertical' restraints, *i.e.* combinations of persons at different levels of the market structure.... Horizontal restraints alone have been character-

ized as 'naked restraints of trade with no purpose except stifling competition,' ... and, therefore, *per se* violations of the Sherman Act.") (emphasis added), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Level I Sportswear, Inc. v. Chaikin*, 1982–1983 Trade Cas. (CCH) ¶ 65,168, at 71,610–11 (S.D.N.Y.1983). In this case, Topps does not and could not contend that the parties to the alleged boycott, the MLBPA and the major league baseball players, are in any sense competitors with each other.

■ Second, as noted above, in a classic group boycott, a group of businesses combine to exclude *other competitors or potential competitors from their level of the market.* Topps certainly does not compete with major league baseball players for the players' publicity rights. Topps merely purchases the rights from the players.

Topps contends, however, that it competes with the MLBPA for the players' publicity rights, and that the MLBPA has instigated the boycott in order to exclude Topps from the market except on those terms the MLBPA dictates. In light of facts set forth above, there can be little doubt that Topps and MLBPA are indeed engaged in a struggle for control of the players' rights. However, it is far from clear that Topps and the MLBPA compete economically at the same level of the market. Topps purchases the rights from the players and uses them in producing and marketing its products. Thus, it is a consumer of the rights. The MLBPA, on the other hand, does not purchase the rights from the players, and does not manufacture or market any products itself. It acts as an agent for the players in licensing manufacturers or distributors of products to use the rights. Thus, the MLBPA is more analogous to a wholesale distributor of the rights. Accordingly, it does not appear to function at the same level in the market as Topps.

■ Finally, a classic group boycott involves a type of arrangement that is so clearly and consistently anticompetitive

that it is inherently illegal. As the Supreme Court stated recently, "[t]he decision to apply the *per se* rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *Northwest Wholesale Stationers, Inc.*, 105 S.Ct. at 2617 (quoting *Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)). I am not persuaded that the arrangement between the MLBPA and the players is one that clearly restricts competition. In fact, the MLBPA has made a strong argument that the arrangement will enhance competition for players' publicity rights for use on a group basis.

Because Topps has for many years managed to secure exclusive long-term licenses from nearly all minor and major league baseball players to use their photographs on trading cards sold alone or in combination with gum or candy, other companies have not been able to acquire similar licenses. Topps has by all appearances acquired its licenses by hard work and perseverance, and should not now be punished for having been successful in its competitive efforts. *See, e.g., United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir.1945). Nonetheless, Topps' competitors are desirous of an opportunity to acquire the rights Topps holds. Topps contends that its competitors can acquire the rights in the same way Topps does—by soliciting ballplayers when they enter the minor leagues. But Topps' competitors have indicated that they are unwilling to do so since that course "would be too expensive, would take too long, and would have too little chance of success." Affidavit of Donald D. Peck in Opposition to Plaintiff's Motion for Summary Judgment ¶ 4. Thus, there is currently little competition for the rights Topps acquires through its player contracts.

■ However, under the arrangement created by the players and the MLBPA, the tremendous expense, inefficiency, and risk in acquiring the full bundle of rights neces-sary to market a complete set of baseball trading cards is eliminated. A company interested in acquiring players' publicity rights would not have to solicit a contract from every individual who becomes a professional baseball player. Instead, Topps and its competitors could purchase the necessary grants from a single agent for all of the major league players. Topps' competitors apparently find this an appealing prospect, and would bid against Topps and each other for the rights Topps now acquires with little serious competition. Topps complains that this may drive up the price of the rights. But that is the natural consequence of increased competition for a limited supply of goods, and is not a ground for concluding that the arrangement between the players and the Players Association is necessarily illegal *per se*.

■ In view of the important differences between classic group boycotts and the arrangement at issue here, I conclude that *per se* treatment is inappropriate. As Professor Sullivan has aptly stated, "[w]hile the boycott concept is infinitely expandable, the *per se* doctrine ought not to be." L. Sullivan, *supra* p. 17, at 256, *quoted in Drayer v. Krasner*, 572 F.2d 348, 355 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978). "When confronted with concerted refusals to deal that do not fit the classic 'group boycott' pattern, courts almost without exception have held the *per se* rule inapplicable." *Smith*, 593 F.2d at 1179 n. 22. I see no reason to do otherwise here.

Accordingly, the propriety of the arrangement between the MLBPA and the players will be measured by the rule of reason. Under that analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). This is typically a complex task; nonetheless, MLBPA has moved for summary judgment on the ground that the current record demonstrates that the

arrangement at issue here is reasonable as a matter of law. I cannot agree.

■ Summary judgment is available only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. There are certainly occasions in antitrust litigation where summary judgment is appropriate, but the appellate courts have counseled that they are relatively rare. The Supreme Court has advised that

> summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury.

*Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Our court of appeals has repeatedly expressed similar concerns. *See, e.g., Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 67–68 (2d Cir.1984); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554–55 (2d Cir.1977). Bearing these advices in mind, I conclude that summary judgment cannot be granted here.

The first issue in any rule of reason analysis is to define the relevant market in which the competitive impact of the defendant's actions are to be examined. *See Hayden Publishing Co.*, 730 F.2d at 69–70; *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 116 (1980). The parties here have devoted little attention to this question, and to the extent they have addressed it, they disagree. The MLBPA appears to claim that the relevant market is that of publicity rights for all athletes and performers, whereas Topps contends that it is the market for the publicity rights of major league baseball players for use on a group basis. Thus, there is a disputed issue of material fact that precludes summary judgment.

Another issue in the rule of reason calculus is the intent underlying the defendant's acts. *See, e.g., Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). Here the MLBPA claims that its intent is to increase competition in the bidding for players' publicity rights, whereas Topps contends that the Players Association intends to obtain monopoly power over those rights. Again, this is a disputed issue of fact. Finally, rule of reason analysis looks to the effects of the defendant's acts on the relevant market. *Id.* The MLBPA claims that its acts are procompetitive, while Topps asserts that it is being improperly foreclosed from competing for players' publicity rights. This is yet another question of fact. Summary judgment is obviously unavailable in these circumstances.

## B. Topps' Monopolization Claims

Complementing section 1, section 2 of the Sherman Act makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2 (1982). There is a substantial interrelationship between the two parts of the statute. For example, a group boycott that is *per se* illegal as a restraint of trade under section 1 may amount to an inpermissible attempt to monopolize or conspiracy to monopolize under section 2 of the statute. As the Supreme Court stated in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959), an illegal group boycott "clearly has, by its 'nature' and 'character,' a 'monopolistic tendency.'" But because, for the reasons stated above, I cannot conclude that the MLBPA has engaged in a group boycott that is *per se* violative of section 1, I am also reluctant to conclude, as a matter of law, that the MLBPA has violated section 2.

■ As the language of the provision would suggest, section 2 encompasses three separate offenses: monopolization, attempted monopolization, and conspiracy to monopolize. Topps alleges that the MLBPA has committed the latter two. *See* Complaint ¶¶ 26–29, Exhibit 1 to Carroll Aff. The Supreme Court has held that the offense of attempted monopolization has two elements: (1) a "dangerous probability of success" in monopolizing a given product market" and (2) a specific intent to "destroy competition or build monopoly." *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *see also Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980). The elements of a conspiracy to monopolize are: (1) a combination or conspiracy deliberately entered into with the specific intent to achieve monopolization of an appreciable part of commerce, and (2) the commission of an overt act in furtherance of the conspiracy. *See, e.g., United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961); *Reborn Enters., Inc. v. Fine Child, Inc.*, 590 F.Supp. 1423, 1451 (S.D.N.Y.1984), *aff'd,* 754 F.2d 1072 (2d Cir. 1985).

■ Summary disposition of these claims not appropriate for the same reasons I discussed in connection with the MLBPA's motion for summary judgment on Topps' section 1 claim. Proof of the relevant market is a necessary element of a cause of action for attempted monopolization, *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), and the defendant's intent to obtain monopoly power is necessary for both attempted monopolization and conspiracy to monopolize. Both of these issues involve disputed questions of fact. Accordingly, Topps' motion for partial summary judgment on these claims and the MLBPA's cross-motion for summary judgment must be denied.

## C. Topps' Motion for a Mandatory Preliminary Injunction

■ In addition to moving for partial summary judgment, Topps has moved for a preliminary injunction. As noted above, on December 31, 1986, Topps' contracts for publicity rights with approximately 100 major league baseball players will expire. Under the terms of their Commercial Authorization Agreements with the MLBPA, these players' publicity rights will, upon the expiration of Topps' contracts, be transferred to the Players Association. Topps seeks a preliminary injunction requiring the MLBPA to exercise its authority under its Commercial Authorization Agreements to license those rights to Topps for the duration of this action.

The general standard for the issuance of a preliminary injunction in this circuit is well settled. Our court of appeals has repeated held that

> a preliminary injunction will be issued when there is a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.,* 749 F.2d 124, 125 (2d Cir.1984) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)); *see also Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 n. 2 (2d Cir.1977); *Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247, 250 (2d Cir.1973). However, where, as here, the moving party seeks a preliminary injunction that is mandatory rather than prohibitory in form, an even greater showing is required. Mandatory injunctions are not granted "unless extreme or very serious damage will [otherwise] result and are not issued in doubtful cases." *Clune v. Publishers' Ass'n,*

214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd per curiam on opinion below*, 314 F.2d 343 (2d Cir.1963); *see also Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir.1981); *Jacobson & Co.*, 548 F.2d at 441.

After carefully considering Topps' motion, I have concluded that it must be denied. In particular, Topps has failed to satisfy me that it will suffer irreparable harm if the injunction it requests does not issue. Topps offers two bases for a finding of irreparable harm. First, it argues that if it cannot market products containing the pictures of over 100 veteran players in its 1987 baseball products line, it will be placed at a serious competitive disadvantage because there are at least three other companies that, by reason of their license agreements with the MLBPA, will be able to continue to advertise and sell baseball product lines containing pictures of *all* major league ballplayers. Topps suggests that in addition to the loss of sales and profits, it will be in danger of suffering a loss of stature, reputation, and identity in the marketplace. Affidavit of Arthur Shorin in Support of Motion for a Preliminary Injunction ¶¶ 5–6, 9. Second, Topps argues that as its player contracts expire, the MLBPA will be able, by virtue of its Commercial Authorization Agreements, to license others immediately, on either an exclusive or non-exclusive basis, to use the rights Topps currently holds. Thus, Topps argues that even if it ultimately prevails in this action, it may not be possible to redress fully the wrong committed because at that time others will claim to be entitled to use the rights the MLBPA has granted to them. *Id.* ¶ 8.

In response to Topps' first contention, that in the absence of the requested injunction it will not be able to produce a complete set of baseball trading cards in 1987, the MLBPA has indicated that it has repeatedly expressed its willingness to grant a non-exclusive license to Topps to exploit the very publicity rights Topps says it is about to lose. *See* Affidavit of Mark H. Belanger in Opposition to Motion for Preliminary Injunction ¶ 4. The MLBPA has made this offer subject to Topps' willing-

ness to negotiate the license on what the MLBPA considers "commerically reasonable terms," *id.*, which I assume means at a price higher than Topps currently pays under its player contracts. No doubt, this offer is unpalatable to Topps in at least two ways. It is self-evident, first, that Topps would rather not pay more for the license the MLBPA would grant than it currently pays and, second, that Topps would rather retain the exclusive license it currently holds than accept a non-exclusive license that would subject it to direct competition from other baseball product manufacturers.

But while these aspects of the MLBPA's proposed deal may not be entirely satisfactory to Topps, the offer does remove the probability that Topps will suffer irreparable harm. A non-exclusive license from the MLBPA would permit Topps to manufacture a complete set of baseball trading cards containing pictures of all major league baseball players. Thus, Topps would suffer no loss of reputation in the marketplace. If Topps must pay a comparatively higher price for this non-exclusive license than it currently pays for its exclusive rights, and if Topps ultimately prevails in this action, this increased cost can be quantified and will constitute an element of Topps' damages. And if Topps suffers a loss of market share as a result of competition from other manufacturers who acquire similar licenses from the MLBPA, that loss also can be measured and will become part of Topps' damages. Thus, it appears that Topps can easily avoid the irreparable harm it claims it will suffer by accepting the offer the MLBPA has made. Topps has made no suggestion that the MLBPA's offer is not made in good faith, or that the MLBPA has refused to negotiate in a reasonable commercial fashion.

For reasons I have already discussed, Topps' second basis for irreparable harm must also be rejected. Topps argues that as its player contracts expire, the MLBPA will be able, by virtue of its Commercial Authorization Agreements, immediately to license others to use the rights Topps cur-

rently holds. Thus, Topps argues that even if it ultimately prevails in this action, it may not be possible to redress fully the wrong committed because at that time others will claim to be entitled to use the rights the MLBPA has granted to them.

If the MLBPA granted an exclusive license to another company to use the rights Topps currently holds, it might indeed be impossible to make Topps whole if it prevails here. But as noted above, the MLBPA is willing to give Topps a license for those rights, and if Topps accepted that offer, the MLBPA could give one of Topps' competitors only a separate non-exclusive license. This of course would permit others to compete directly with Topps, but that would not cause irreparable harm. Topps will be in a position to measure any loss of its market share, calculate its lost profits, and recover damages from the MLBPA in the event it prevails. This is not an insurmountable task; indeed, it is commonplace in antitrust litigation.

Thus, I conclude that Topps is in a position to avoid the irreparable harm it says it faces by accepting the MLBPA's offer to grant it a non-exclusive license to use the publicity rights of the 100 players whose contracts will expire at the end of this year. Under these circumstances, it is inappropriate for the Court to order extraordinary relief. *See, e.g., Cronin v. Executive House Realty*, No. 80 Civ. 7254 (WCC), slip op. at 14–17 (S.D.N.Y. Feb. 5, 1981); *Frischman v. Durand*, 350 F.Supp. 79, 82 (S.D.N.Y.1972). Accordingly, Topps' motion for a mandatory preliminary injunction is denied.

*Conclusion*

For the reasons set forth above, Topps' motion for partial summary judgment, and the MLBPA's cross-motion for summary judgment are denied. Topps' motion for a mandatory preliminary injunction is also denied. The parties are directed to proceed with their pretrial discovery, and to appear for a pretrial conference on Friday, September 19, 1986 at 10:00 a.m. in Courtroom 618. The Court will set a trial date at that time.

SO ORDERED.