**TOPPS CHEWING GUM, INC.,**
**Plaintiff-Appellee,**

v.

**FLEER CORPORATION, Defendant,**

**Major League Baseball Players Association, Defendant-Intervenor-Appellant.**

**No. 69, Docket 85–7356.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 18, 1985.

Decided Aug. 25, 1986.

See also D.C. 641 F.Supp. 1179.

Harold F. McGuire, Jr., New York City (Terri E. Simon, New York City, on the brief), for defendant-intervenor-appellant.

Martin I. Shelton, New York City (Daniel L. Carroll, Peter G. McDonough, New York City, on the brief), for plaintiff-appellee.

Before OAKES and NEWMAN, Circuit Judges, and POLLACK, District Judge.*

* The Honorable Milton Pollack of the United States District Court for the Southern District of New York, sitting by designation.

JON O. NEWMAN, Circuit Judge:

Thirty-three years ago Topps Chewing Gum, Inc. was before this Court as a defendant in a suit by a rival gum manufacturer alleging that Topps was selling baseball cards and chewing gum in violation of exclusive rights that baseball players had given to Topps' rival. *See Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir.), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). In an important ruling recognizing a "right of publicity," *id.* at 868, this Circuit held that a ball player had a property interest in his photograph and likeness that could be exclusively licensed. Three years after that decision opened up the marketing of exclusive rights of publicity, Topps entered the field and purchased from another gum manufacturer exclusive licenses to use photographs of a large number of baseball players in connection with the sale of gum.

Since then Topps has become the undisputed leader of the baseball card business, having obtained exclusive licenses from virtually every person now playing baseball in the major leagues. This success has not gone unnoticed. Today Topps is before us again, this time as a defendant to a counterclaim brought by the Major League Baseball Players Association ("MLBPA" or "the Association") alleging that Topps' aggregation of exclusive licenses constitutes an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982). In a decision of the District Court for the Eastern District of New York (Jack B. Weinstein, Chief Judge), summary judgment was granted in favor of Topps, rejecting the Association's antitrust claim on its merits. For reasons that follow, we conclude that under the unusual circumstances of this litigation, the Association's counterclaim presents no justiciable issue. We therefore reverse and remand with directions to dismiss the counterclaim without prejudice.

The reasons for this anticlimactic disposition emerge upon consideration of the tangled history of contracts and litigation concerning baseball cards. The cards, as most school children know, measure 2½ by 3½ inches and display the name, picture, and signature of a player on the front and his career statistics on the back. They originated in the 1880's. Between 600 and 700 cards are now issued each year. The cards are marketed in one of three ways: (1) cards sold alone, in packages of 14 or more, (2) cards sold *with* a premium, *i.e.,* an item that is not the primary motivation for purchasing the combination, and (3) cards sold *as* a premium, *i.e.,* combined with an item that is the primary motivation for purchasing the combination. An example of the second category is a package marketed by Topps containing 15 baseball cards and one piece of bubble gum. Examples of the third category are a box of cereal that includes one or more baseball cards or giving away one or more cards with the purchase of a hamburger.

Topps obtains rights of publicity from baseball players by means of individual contracts for exclusive licenses. These player contracts, all in standard form, are solicited by Topps from baseball players while they are competing in the minor leagues. The contract assigns to Topps the exclusive right to publish the player's name, picture, signature, and biographical sketch "to be sold either alone or in combination with chewing gum, candy and confection, or any of them." The player receives $5 for signing, $250 for each year of the contract in which the player is a member of a major league team, and $75 for each two-year extension of the term of the contract. The contract ends, unless extended, after the fifth year in which the player has received the $250 payment for being with a major league team. Topps is also obligated to pay to the MLBPA the amount by which specified percentages of royalties on sales of Topps products that use players' rights exceed the $250 and $75 payments made to all players in any one year.

A 1968 agreement between Topps and the MLBPA modified the terms of Topps' player contracts from what they had been prior to 1968 to the terms set out above.

The MLBPA also contracts with baseball players to merchandise their publicity rights. Virtually all players, once they become members of a major league team, sign a commercial authorization agreement with the MLBPA. This agreement grants the Association the exclusive right to convey group licenses to others to use the player's name, signature, and picture. The agreement excludes group licensing contracts with merchandisers for rights covered by players' contracts respecting competitive products. By virtue of this exclusion, the MLBPA lacks the authority to license any merchandiser to sell baseball cards within the scope of Topps' player contracts, *i.e.*, to sell baseball cards "alone or in combination with chewing gum, candy and confection."

In 1981, pursuant to the commercial authorization agreement, the MLBPA granted a non-exclusive license to the Fleer Corporation to sell baseball cards and similar products "in conjunction with a major league team Logo sticker." The sticker, displaying the name and insignia of a major league baseball team,[1] is affixed to a card the size of a baseball card in such a manner that it may be peeled off and affixed elsewhere. Fleer sells packages of 15 baseball cards and one team logo sticker.

Before obtaining its right to sell baseball cards in combination with a team logo sticker, Fleer sued Topps and the MLBPA in the Eastern District of Pennsylvania, alleging that Topps' aggregation of player contracts, the 1968 agreement between Topps and the MLBPA, and the MLBPA's commercial authorization agreement with the players precluded effective competition in the sale of baseball cards in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The trial court upheld Fleer's contention and enjoined the exclusivity feature of Topps' player contracts. *Fleer Corp. v. Topps Chewing Gum, Inc.,* 501 F.Supp. 485 (E.D.Pa.1980). The Third Circuit reversed, concluding that no antitrust violations had been established. *Fleer Corp. v. Topps Chewing Gum, Inc.,*

658 F.2d 139 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). Upholding the lawfulness of the player contracts, the Third Circuit ruled, "Taken individually, or even as an interlocking network, the agreements at issue do not rise to the level of a section 1 violation." *Id.* at 153.

In 1983 Topps initiated the lawsuit that gives rise to this appeal. Topps sued Fleer in the Eastern District of New York, alleging that Fleer's marketing of packages of 15 baseball cards and one team logo sticker violated Topps' exclusive right to market baseball cards "alone." The theory of Topps' suit was that the team logo sticker was a "sham" product, included in the Fleer package "as a pretext for selling Baseball Cards ... in violation of [Topps'] exclusive rights" under its contracts with the players. Complaint ¶ 12. Fleer and the MLBPA had evidently been aware of Topps' contention that its exclusive right to sell baseball cards "alone" could not be circumvented by selling cards in conjunction with an item of nominal value. The contract by which the MLBPA granted group licensing rights to Fleer for the cards and logo sticker combination specified that the production cost of the logo sticker shall not be less than 15% of the production cost of the baseball cards in a package.

After Topps' suit was filed, the MLBPA sought and was granted intervention as of right as a defendant in the action. The MLBPA asserted various defenses to Topps' complaint and also asserted the counterclaim that is our particular concern on this appeal. The counterclaim, paragraphs 41–50 of the MLBPA's pleading, seeks declaratory and other (unspecified) relief for Topps' alleged violation of section 1 of the Sherman Act. The theory of the counterclaim emerges upon examination of the key paragraphs. Paragraph 43 refers to Fleer's antitrust suit in the Eastern District of Pennsylvania, and paragraph 44 represents that "[a]t the conclusion of that antitrust litigation, it was held that

---

**1.** Fleer obtains rights to use the team logos directly from the major league teams.

[Topps'] Player Contracts, policies and practices did not unlawfully restrain trade in the relevant market within the meaning of Section 1 of the Sherman Act." Paragraph 45 recites the basic terms of the 1981 agreement between the MLBPA and Fleer for the right to market the combination of baseball cards and a team logo sticker, noting the 15% production cost floor applicable to the sticker. Paragraph 46 alleges that there is "an actual controversy between Topps and the MLBPA concerning whether the products marketed by Fleer pursuant to the MLBPA–Fleer agreement infringe upon the contract rights granted to Topps by individual major league baseball players, and whether (*if* such contract rights are infringed) the MLBPA is injured in its business and property by reason of something forbidden by the antitrust laws" (emphasis added). Paragraph 47 denies that Fleer's combination product infringes any rights of Topps'. Paragraph 48 alleges, "By the instant litigation [Topps' suit against Fleer], Topps now seeks to interpret and implement its Player Contracts in such a way as to restrain trade and commerce ... in violation of Section 1...." Paragraph 49 alleges that "Topps now attempts to interpret its exclusive right to sell Baseball Pictures 'alone,' granted to it in its Player Contracts, as constituting the exclusive right to sell, and therefore prohibit others from selling, Baseball Pictures with low-cost, nonconfectionery premiums. Topps seeks to implement that interpretation through this litigation." Paragraph 50 asserts that the MLBPA is entitled to a declaratory judgment "that Topps's Player Contracts may not be so interpreted, and *if* so interpreted may not be enforced" (emphasis added).

The counterclaim thus makes both a contract rights claim and an antitrust claim and specifically relates the latter to the former. Topps is accused of unduly broadening the interpretation of the word "alone" in its player contracts to bar Fleer from selling baseball cards in combination with a team logo sticker. Topps is also accused of violating section 1 *if* it is correct

in interpreting its player contracts to mean that Fleer's sale of its combination package infringes Topps' exclusive right to sell baseball cards "alone."

After the counterclaim was filed, Topps and Fleer settled Topps' claim that Fleer's sale of its combination package infringes Topps' exclusive rights. That settlement did not necessarily resolve either the contract rights dispute between Topps and the MLBPA or the contingent antitrust dispute. Proceedings therefore continued on the MLBPA's counterclaim. On November 23, 1984, at the District Court's suggestion, counsel for the MLBPA, Harold McGuire, submitted a letter intended to clarify the nature of the Association's antitrust claim. Three contentions were advanced to show that Topps' player contracts restrain trade unreasonably. First, the broad interpretation of "alone" gives Topps undue scope for its exclusive licenses. Second, the player contracts are unduly restrictive because they remain in effect until the conclusion of a player's first five seasons in the major leagues and because they preclude the players from negotiating future licenses with others during the life of Topps' contracts. Third, Topps has not used all of the exclusive rights it owns under the player contracts; it does not sell baseball cards with candy or confections other than gum. Counsel's letter reemphasized the contingent nature of the antitrust claim: "*If* Topps's contracts contained *in haec verba* a grant of rights as broad as those which Topps contends the word 'alone' connotes, the contracts would plainly, on their faces, be in unreasonable restraint of trade" (emphasis added).

With the counterclaim thus "clarified," Topps sought summary judgment, contending primarily that the Third Circuit's decision barred the MLBPA's counterclaim because of collateral estoppel, that the MLBPA's representations in the Pennsylvania litigation barred the counterclaim as a matter of judicial estoppel, and, in any event, the Third Circuit's decision was well-reasoned authority that should be followed

on the lawfulness of Topps' player contracts.

At a brief hearing on the summary judgment motion, the seeds of the difficulties facing us on this appeal were sown. In arguing against Topps' claim that the Pennsylvania judgment was collateral estoppel as to the lawfulness of Topps' player contracts, counsel for the MLBPA contended that Topps' interpretation of its contract rights had changed. In Pennsylvania, he pointed out, Topps and the MLBPA had defended Topps' player contracts on the ground that they permitted competitors to sell baseball cards with low-cost non-confectionery items; now, he asserted, Topps is claiming a broadened interpretation of "alone" that precludes competitors like Fleer from selling baseball cards with low-cost non-confectionery items. That argument elicited the following exchange:

> The Court: Well, that's an interpretation of the contract. Anybody who disagrees can get an interpretation from the Court with respect to what the contract means.
>
> McGuire: That's why we are here.
>
> The Court: No. You are here on an antitrust claim, not on a decision to decide what the contract means.
>
> McGuire: Well, not quite, Your Honor. If you go back to our pleadings, it is plain that we contend, one, that Topps' contracts don't mean what they say they mean.
>
> The Court: I know. That's not why you are here.
>
> McGuire: Oh, yes.
>
> The Court: Well, that's not the way I interpret the way this case has been framed. I interpret this as an antitrust case, not as a contract interpretation case. I don't think it's ever been presented to me as a contract interpretation case where you want a declaratory judgment, that the contract means so and so.

Subsequently, the District Court questioned whether the MLBPA had standing to secure an adjudication of Topps' player contracts because the MLBPA was not a party to those contracts. The colloquy then returned to whether the contract interpretation issue was in the case, with McGuire endeavoring to call to the District Court's attention the paragraph of the counterclaim that pleaded the contract issue. That discussion ended when the District Court remarked, "I'm sure you have one paragraph, but it's miniscule [*sic*] compared to what this case is all about."

The colloquy then turned to the merits of the antitrust aspect of the counterclaim. The District Court expressed the view that the Third Circuit "was aware of Topps' contention with respect to what the [player] contract meant" and had ruled that the player contracts did not violate section 1. Chief Judge Weinstein stated that there was no point in trying the antitrust issue prior to a ruling from this Court as to whether it agrees with the Third Circuit. He added:

> I can get a ruling one of two ways: either denying summary judgment and certifying it, or granting it and letting it go up.
>
> It's easier, it seems to me, to grant it[,] then letting it go up because there's clearly a dispositive issue of law here that will save a great deal of time and that ultimately has to be decided by the Court of Appeals anyway.

Then, expressing agreement with the Third Circuit, the District Court granted Topps' motion for summary judgment dismissing the counterclaim on the merits.

The parties' contentions on appeal reflect the difficulties encountered in the District Court in determining what the case is about. The MLBPA contends that Topps' player contracts, as currently interpreted and enforced, are different from those considered by the Third Circuit and that for this reason, among others, the Third Circuit's decision cannot be dispositive, either as collateral estoppel or even as *stare decisis*. Topps maintains that the scope of its contracts is unchanged and that it should therefore prevail in light of the Third Circuit's decision.

As must be painfully evident from this protracted recital of the events leading up to this appeal, the District Court was incorrect in viewing the counterclaim as presenting only an antitrust claim. The counterclaim explicitly frames an issue of contract interpretation and seeks a declaratory judgment that Topps' player contracts mean what the MLBPA says they mean, rather than what Topps says they mean. The precise contract issue between the parties is whether or not the player contracts include within the grant of exclusive rights owned by Topps the right to sell the combination of baseball cards and a team logo sticker being marketed by Fleer. Whether minuscule or not, paragraph 46 of the counterclaim raises that issue squarely. Moreover, the counterclaim is precise in raising the contract issue as one preliminary to the antitrust issue. The MLBPA has not come to court claiming that Topps' player contracts, as presented in the Pennsylvania suit, violate section 1. Even if the MLBPA could make such a claim in light of their litigating stance in the Pennsylvania suit,[2] it is far from clear that the Association wishes to have the contracts of its members invalidated, so long as those contracts permit the MLBPA to license others to sell baseball cards in combination with low-cost non-confectionery items like Fleer's team logo sticker.[3] In fact, one inference from the record is that the antitrust claim may have been advanced as a contingent claim in order to exert some pressure on Topps to abandon or at least modify the breadth of its interpretation of its player contracts. In any event, the only antitrust claim the MLBPA makes in this litigation is that the player contracts violate section 1 *if* they are properly construed to have a scope that precludes Fleer from selling its combination product.

What the District Court has done is not only fail to decide a contract issue that was properly pleaded but decide an antitrust issue that may not be in the case at all.

■ We therefore turn to the contract issue, the predicate to the MLBPA's antitrust claim. We reject at the outset the District Court's suggestion that the MLBPA lacks standing to obtain a declaratory judgment as to the meaning of Topps' player contracts. The MLBPA holds rights that are vitally affected by the scope of those contracts. The players have given the MLBPA the right to convey group licenses for all of the players' publicity rights except those that the players have previously assigned, *e.g.*, the rights assigned to Topps. The scope of the MLBPA's rights is a function of the scope of Topps' rights. The Association has standing to adjudicate the meaning of Topps' player contracts in order to ascertain the scope of its own residual rights obtained from the players. *Cf. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965) (patent rights); *Hanes Corp. v. Millard*, 531 F.2d 585, 592 (D.C.Cir.1976) (same). The MLBPA need not wait until Topps challenges the Association's right to license someone else to market a combination of cards and a low-cost premium similar to Fleer's package. Once Topps has claimed a broad interpretation of its contract with Fleer, the MLBPA has standing to challenge that interpretation. That was the basis on which the MLBPA was allowed to intervene as of right.

■ On the merits of the contract issue we cannot ascertain the parties' precise contentions except as they relate to the Fleer combination product. The counterclaim seeks a declaration only that the

---

**2.** On this appeal the MLBPA candidly concedes that it supported the lawfulness of Topps' player contracts in the Pennsylvania litigation and does not "quarrel with" the Third Circuit's view, characterized by the MLBPA as dictum, that Topps' contracts were not, "in and of themselves, unreasonable," 658 F.2d at 150. Brief for Appellant at 20.

**3.** If the MLBPA were to succeed in eliminating the exclusivity feature of Topps' player contracts, it would be interesting to see whether the price of baseball cards to the ultimate consumers would fall because of price competition between card sellers or rise because the players would charge more for sale of their rights in a market more open to Topps' rivals.

Fleer combination product is not barred by Topps' contracts. However, McGuire's November 23, 1984, letter asserts that the Association seeks a declaratory judgment "that the word 'alone,' in Topps's player contracts, has its normal dictionary meaning," a view that would presumably permit the Association's licensees to sell baseball cards in combination with any other item, no matter how trivial. In its brief to the Third Circuit, however, the MLBPA asserted that it "construed 'alone' to mean 'alone or with premiums of nominal value.'" Moreover, the Association's executive director testified in the Pennsylvania trial that Topps' exclusive rights would be infringed by sale of cards "with a completely valueless item." In a deposition in the pending litigation, the executive director testified that the Association would not grant a license for the sale of baseball cards with "a trivial product," which he illustrated with the example of a marble.[4] Topps' position on the meaning of "alone" is also imprecise. Its complaint against Fleer asserted the right to preclude sale of the Fleer combination product because the team logo sticker was a "sham" product used as a "pretext" for selling baseball cards in violation of Topps' rights. No standard for determining when a product is a "sham" has been put forth in this suit. Topps has allegedly informed the MLBPA previously that the only way a licensee of the Association can be sure of avoiding an infringement claim by Topps when an item is packaged with baseball cards is to make sure that the production cost of the item at least equals the production cost of the cards in the package.

With the parties' contentions in such disarray, the only contract issue that could possibly be adjudicated is the one framed precisely by the counterclaim—whether the "alone" provision bars Fleer from selling baseball cards with a team logo sticker.

On that issue we have no evidence such as production cost of the sticker or the extent, if any, to which the sticker motivates purchases of the package, and we have no findings by the trial court as to the meaning of the contract. Normally, we would at this point return the matter to the trial court for further proceedings on the contract rights claim. That course, however, encounters a substantial obstacle arising from the settlement of the contract dispute between Topps and Fleer.

The *fact* of the settlement does not lessen the right of the MLBPA to obtain a declaratory judgment. The settlement ends the dispute between Topps and Fleer as to whether Fleer's package infringes Topps' exclusive rights, but it does not end the dispute on this question between Topps and the MLBPA. A holder of rights capable of being licensed would be in a perilous position if a third party claiming infringement asserted claims against the holder's licensees, settled these claims, and then avoided adjudication with the holder as to the scope of the third party's rights. Moreover, if the Fleer combination product infringes Topps' rights, the MLBPA might be liable to Topps for contributory infringement. *See Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir.1963) (copyright); *Huber Baking Co. v. Stroehmann Brothers Co.,* 252 F.2d 945 (2d Cir.) (trademark), *cert. denied,* 358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958); 3 *Nimmer on Copyright* § 12.04, at 12–36 (1985). However, the *terms* of the settlement between Topps and Fleer have altered the nature of the contract issue that the MLBPA wishes to litigate. Though the precise terms are confidential, it suffices to note that the settlement increases the minimum cost of the logo sticker compared to the cost of the baseball cards in the Fleer package and also specifies requirements concerning how

---

4. The MLBPA's example of a marble as an item so insubstantial that its inclusion in a package of baseball cards would infringe Topps' right to sell cards "alone" is interesting in light of the 1965 decision of the Federal Trade Commission concluding that Topps had not violated section 5 of the Federal Trade Commission Act, 15 U.S.C.

§ 45 (1982). *In re Topps Chewing Gum, Inc.,* 67 F.T.C. 744 (1965). The Commission relied on the freedom of Topps' competitors to sell baseball cards with non-confectionery products and specifically mentioned marbles as a product with which baseball cards could be sold by Topps' competitors. *Id.* at 839.

prominently the logo sticker must be featured in packaging and in advertisements for the package.

It thus appears, though we cannot be certain, that the package Fleer is now selling pursuant to the settlement is different from the one it was selling in 1983 when the MLBPA filed its counterclaim. It is the 1983 package that the MLBPA alleged was not an infringement of Topps' rights and that Topps alleged did infringe its rights. What position Topps would take with respect to the package Fleer is now selling under the terms of the settlement we do not know. Even if the changes in presentation and advertising are minor, they can have a major bearing on the issue of whether the premium item offered with the baseball cards is a sham product. Cost of the premium may not be controlling. If the premium is marketed to the public as something worth buying, that is some indication that it is not a sham product. Obviously Topps cannot complain against Fleer that the current package, if conforming to the settlement, violates Topps' rights. But there might still be a live controversy between the MLBPA and Topps as to whether Fleer's current package is within the scope of Topps' exclusive rights. The MLBPA might also have a live controversy with Topps as to whether packages sold by other licensees of the MLBPA are within the scope of Topps' rights. However that may be, the counterclaim the MLBPA has brought focuses solely on the package Fleer was marketing in 1983. The controversy as to whether that package is within Topps' exclusive rights would appear to be moot, if in fact the package is no longer being sold. Topps contends on appeal that the MLBPA is not now entitled to a declaratory judgment with respect to Fleer's 1983 package, and the MLBPA has made no response to this contention.[5]

Unfortunately, because of the way the case was routed to this Court in the hope of saving time, we now have nothing before us to adjudicate. The contract claim seeks a declaration as to a package that appears to be no longer marketed. Moreover, that claim has been neither tried nor adjudicated. We cannot adjudicate the antitrust claim because that claim is based on an interpretation of the player contracts that may or may not be correct. To rule on the antitrust claim now would be to render an advisory opinion on a hypothetical question—whether the contracts would violate section 1 if interpreted to preclude sale of Fleer's 1983 package.

We could simply remand to the District Court with directions to permit the MLBPA to amend its counterclaim to frame a justiciable contract issue and to renew its antitrust claim either as a contingent claim that depends on resolution of a justiciable contract issue or as a claim that stands independent of a contract issue. Under all the circumstances, however, despite the lapse of time since the counterclaim was filed, we think the better course is to reverse the judgment adjudicating the antitrust claim on its merits and remand with direction to dismiss the counterclaim without prejudice as non-justiciable. This will permit the MLBPA to begin anew, if it is so advised, with whatever contract and/or antitrust claims it wishes to present. This course will also afford the MLBPA the option of seeking leave to pursue any claim it may have against Topps as a counterclaim in Topps' suit against the MLBPA now pending in the Southern District of New York before Judge Conner. *Topps Chewing Gum, Inc. v. Major League Baseball Players Association,* 641 F.Supp. 1179. With the cooperation of Chief Judge Weinstein and Judge Conner, it would seem advantageous to have the entire controversy between the parties resolved in a single forum.

Reversed and remanded with directions to dismiss without prejudice. No costs.

---

**5.** A justiciable controversy would exist if Topps had made a claim against the MLBPA for contributory infringement with respect to Fleer's 1983 package, but Topps has not asserted such a claim, and the MLBPA does not assert that it apprehends any controversy concerning such a claim.