**Robert M. BOGAN and Scott M. Bogan, Plaintiffs,**

v.

**NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY and Austin E. Hodgkins, Jr., Defendants.**

**No. 91 Civ. 2221 (WCC).**

United States District Court, S.D. New York.

Feb. 5, 1997.

Doar Devorkin & Rieck, New York City (Michael S. Devorkin, of counsel), for Plaintiffs.

Schnader, Harrison, Segal & Lewis, New York City (Peter Jason, of counsel), for Defendant Northwestern Mutual Life Insurance Company.

Bleakley, Platt & Schmidt, White Plains, NY (Timothy P. Coon, of counsel), for Defendant Austin E. Hodgkins, Jr.

### OPINION AND ORDER

WILLIAM C. CONNER, SENIOR District Judge.

Plaintiffs Robert M. Bogan ("Bogan" or "Robert") and Scott M. Bogan ("Scott"), jointly and separately, have brought various claims against defendants Northwestern Mutual Life Insurance Company ("NML") and Austin E. Hodgkins, Jr. ("Hodgkins") on sixteen separate causes of action arising out of Robert Bogan's termination as an insurance agent.[1]

The only federal claim in this case is brought by both Robert and Scott Bogan against Hodgkins for federal antitrust violations (1st cause of action). Together they have also brought claims against Hodgkins for state antitrust violations (2nd) and tortious interference with prospective contractual relations with other General and Sales Agents (7th). Against NML they have brought a joint claim for tortious interference with existing contractual relations with Hodgkins (5th). They have also brought a claim for fraud against both Hodgkins and NML (11th).

Robert Bogan alone has brought claims against Hodgkins for: breach of contract (3rd), conspiracy to violate fiduciary duty (10th) and four claims for defamation (causes 14–17). He has brought claims against NML for: breach of written contract (4th), breach of implied contract (8th), and unjust enrichment (9th). Finally, he has brought claims against both defendants for conversion (13th), and tortious interference with his contracts with his Sales Agents (6th).

---

1. There were originally 17 causes of action, but the 12th, under New York Deceptive Trade Practices, was dismissed by Judge Broderick. (See Order of 11/29/95).

The asserted basis for jurisdiction in this case is a federal claim under the antitrust laws, with pendent jurisdiction over the state claims. While there would be diversity jurisdiction over the claims of Scott Bogan, a Connecticut resident, complete diversity does not exist because Hodgkins and Robert Bogan are both New York Residents. Before the Court are Defendant Hodgkins' and Defendant NML's motions for summary judgment on all counts pursuant to FED.R.CIV.P. 56(c).

## BACKGROUND

Defendant NML insurance is a mutual insurance company that sells life insurance through a system of General Agents, District Agents, Sales Agents and Special Agents. NML contracts with its General Agents and generally assigns them each an exclusive territory. In the New York Metropolitan area, however, five General Agents share the same territory. General Agents, in turn, contract directly with District and Special Agents who are approved by NML. The District Agents in turn contract directly with Sales Agents. On the policies they sell, District, Special and Sales Agents are compensated by commissions on the initial premium and renewal premiums for the next nine years; General Agents receive an override commission on the commissions paid to the District, Special and Sales Agents.

Defendant Hodgkins, a New York resident, was during all times relevant to this dispute, a General Agent for NML in the New York Metropolitan Area. Robert Bogan started with NML as a Sales Agent in 1976. From 1982 to 1987, he managed a District Agency under Hodgkins and in 1987 became a District Agent under Hodgkins' General Agency. On May 29, 1990, he was terminated by Hodgkins with 30 days notice effective June 30, 1990. On June 4, after a dispute involving Bogan's failure to turn over his records to Hodgkins, he was terminated for cause.

Robert's brother Scott joined NML in 1985 as a Special Agent under Hodgkins' predecessor, Hamilton; he later became a Special Agent under Hodgkins. In 1987 he signed a Special Agent's contract under Robert. All of the contracts of the Special Agents in Bogan's District Agency, including that of Scott, were terminated when Robert was terminated. As discussed above, Scott joins Robert in five of Robert's sixteen claims.[2]

As Robert Bogan presents them, the pertinent events leading up to his termination are as follows:

In 1990, Bogan was a highly successful District Agent for NML, ranked approximately fourth out of 300. Up until that point, he had invested over $1.5 million in the development and improvement of his District Agency. During his tenure as District Agent, the District Office size had increased from three to eleven agents, while annual sales had increased from $11 to $120 million. Bog.Aff. ¶¶ 141–149.

NML's agency contracts contain strict limitations on its agents' writing business with other carriers (exclusive agency clauses). Prior to his termination, some of Bogan's agents were violating their exclusivity clauses and when Bogan attempted to enforce the clauses, they complained to Hodgkins who "told him [Bogan] not to interfere with what his Soliciting Agents were doing and began to plan to take away Bogan's District Agency and give it to two of Bogan's Soliciting Agents who were friends of Hodgkins." Pl. Br. p. 4–5. On May 29, Hodgkins terminated Bogan without cause "even after NML had repeatedly promised in writing that it would not permit such terminations." *Id.* In a June 1 phone conference, Bogan told Dennis Tamscin, NML Senior Vice President—Agencies, some "very, very serious violations of the law have been committed by Hodgkins," that his agents were receiving checks from other insurers, and that "research needs to be done." Hdgk.Exh. J p. 6–8. Tamscin told Bogan to give Hodgkins access to the files or he would support Hodgkins'

---

**2.** Scott Bogan has not submitted separate briefs to this Court but has relied upon Robert Bogan's submissions. Thus, throughout this opinion we will address the arguments presented by Robert Bogan, making explicit reference to Scott Bogan's claims only where they differ from Robert's.

termination of Bogan for cause. Tamscin added that, if Hodgkins so terminated him, he would not be able to take his District Agency with him when he left. *Id.*

On June 4th at 8:00 a.m., Hodgkins went to Bogan's offices and demanded that he turn over "all of [his] records" and "refused to give him time to consult with his attorney as to his rights and to coordinate with his attorney an orderly transfer." Pl.Br. p. 4. Bogan asserts that there were legitimate questions regarding which records belonged to NML and which were his personal files and that he asked Hodgkins to wait an hour until 9:00 a.m. when Bogan's attorney would be available. Hodgkins refused and notified him that he would be terminated for cause effective at 5:30 that day. Bog. 3(g) stmt. ¶ 24. Scott Bogan's contract was also terminated (as were all of Bogan's Soliciting Agent's contracts), and he was told he could only recontract with the Hodgkins agency. *Id.* at ¶ 29.

Bogan alleges that Hodgkins terminated him wrongfully and that pursuant to an agreement amongst the General Agents he calls the "Metropolitan Agreement,"[3] once he was terminated for cause, he was prevented from either transferring as an active agent, or recontracting after his termination. It is this termination, the events that surrounded it and the alleged Metropolitan Agreement that give rise to the sixteen separate causes of action Bogan has brought before this Court.

Defendants' version, though largely in agreement, puts a different slant on the facts. They assert that there were numerous problems in Bogan's district agency, evidenced by the multiple complaints Bogan's Agents had made to NML. According to Tamscin, Bogan's Agents considered him "dictatorial", Tamscin Reply Aff. for NML, ¶ 41, and complained about his policy regarding expense reimbursement and outside business. For example, Bogan allegedly charged his agents $3.50 per page for faxes, and demanded 20% of any commissions on outside business done through his office. *Id.* at ¶¶ 14, 15. Tamscin testified that in January of 1990 representatives of the Special Agent's association (SAI—Special Agents, Inc.) had talked to Bogan about the complaints they had received from his agents; in February 1990, Kent Beebe of NML visited Bogan's agency because of the "problems there;" and in April, Richard Storatz, one of Bogan's agents, wrote a letter to Tamscin in which he described Bogan as "a district agent run amok, subverting the values of the company from within." *Id.* at ¶¶ 41, 45, 48.

Hodgkins testified that prior to his termination of Bogan, he and Bogan had attempted to "resolve some myriad of issues, and were making some progress, certainly in some areas, and other areas we weren't." Hdgk.Depo. p. 21. He states that Bogan offered to step down as District Agent if the difficulties could not be resolved. *Id.* at 189.[4] He adds that only then did he terminate Bogan without cause and that "Bogan's response ... was to lock out two agents [Bob Slocum and Paul Wintrich]," Hdgk.Br. p. 1., and deny them access to their records includ-

---

**3.** The origin and sponsorship of this "Metropolitan Agreement" are difficult to discern from Bogan's submissions to this court. He states in his 3(g) statement that "beginning no later than 1984, the General Agents reached an agreement called the Metropolitan Agreement which restricted agents in one agency from transferring to another area agency either voluntarily or upon termination." Bog. 3(g) stmt. ¶ 35. He apparently asserts that the substance of this agreement is contained in the document "Company Policy on Metropolitan Transfers." Bog. 3(g) stmt. ¶ 37 ("In 1989, NML decided for legal reasons that the Agreement would look better and have a better legal defense if it were called a company policy.").

For his part, Hodgkins apparently does not dispute that what he calls the "Metropolitan Policy," (*see* Hdgk.Exh. V), emerged from a 1989 meeting of NML General Agents. However, he asserts that the document is "improperly characterized" as an *agreement* amongst General Agents, when it is merely the NML company *policy*. Although Bogan, as the non-moving party, is entitled to have all disputed facts construed in a light favorable to him, for simplicity's sake, this Court will refer to Exh. V by its title—the "Metropolitan Policy." However, for purposes of the merits of Bogan's claim, where relevant, this Court will assume that the General Agents agreed to its provisions.

**4.** *See* Hdgk.Exh. C, 6/2 Memo from Bogan to Hodgkins, stating: "I'm sure we can find a livable/workable solution even if that means my stepping down."

ing "one-card files" essential to an agent's ability to conduct day-to-day business. NML 3(g) stmt. ¶ 2. Hodgkins asserts that at that point, the Metropolitan Policy did not apply to Bogan as a former agent terminated without cause, and that he was free to transfer (alone, without his Soliciting Agents). Hodgkins states that only after Bogan refused his and Tamscin's demands to turn over the records did he fire Bogan for cause, thus rendering him unable to transfer to another General Agency.[5]

Hodgkins asserts that he was justified in firing Bogan and that his termination was neither a breach of contract nor part of an antitrust conspiracy, but part of a strategy to improve the management of his General Agency. He has brought a motion for summary judgment on all counts of the Bogans' complaint. Because Bogan's antitrust claim is the asserted basis for federal jurisdiction, we discuss it first.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to

resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11.

However, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. Specifically, "conduct as consistent with permissible conduct as with [an] illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* There must be direct or circumstantial evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). Moreover, in antitrust cases, "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Apex Oil v. DiMauro*, 822 F.2d 246, 253 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987) ("... the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence").

While "several courts have noted that summary judgment disposition of antitrust cases is difficult to obtain because of their inherent factual complexity, ... that does not mean that summary disposition is thereby precluded or disfavored in antitrust law." *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc.*, 996 F.2d 537, 541 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Rather, "as the Supreme Court observed in *Matsushita*, summary judgment remains a vital procedural

---

**5.** Hodgkins claims that this termination for cause was perfectly justified under Bogan's District Agency Contract. The contract provides in relevant part:

12. Records—District Agent shall hold and preserve all records relating to transactions by or for the company ... and shall surrender them to the General Agent or the Company on demand.

20. Term of Agreement— ...
    It may be terminated by the General Agent upon written notice to the District Agent, by reason of ...
       (ii) Failure of the District Agent to comply with any of the terms hereof, ...
    It may be terminated by either party at any time, without cause, upon thirty days' written notice.
Exh. A, NML 3(g) stmt.

tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces." *Id.*

## II. THE ANTITRUST CLAIM

### A. *The Nature of the Antitrust Claim*

At the heart of Bogan's antitrust claim is the Metropolitan Policy which Bogan alleges was an agreement among NML General Agents not to compete for the services of existing agents by restricting their transfer. According to this document (whose full title is "NML Company Policy on Metropolitan Transfers"), *active* agents could not transfer between General Agents without the permission of both the agent's former and future General Agent. The Policy next provided that "agents who are 'terminated' by a General Agency will not automatically be prevented from contracting with another General Agency unless [they were fired for cause]." [6] Bogan contends his firing on 30 days notice and subsequent dismissal for cause were unjustified, and that Hodgkins'

actions in agreeing to the Metropolitan Policy and then firing him involve a course of conduct designed to exclude him from the NML system that constitutes "a contract, combination and conspiracy in restraint of trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1." [7] As best we can ascertain from Bogan's rather confusing claim, he seems to allege that the Metropolitan policy enabled Hodgkins to: (1) wrongfully prevent Bogan's transfer while he was an active agent (*see* ¶ 1 of the Policy), and (2) continue to exclude Bogan from recontracting with another NML agency thereafter by deliberately trumping up a "cause" for dismissal (*see* ¶ 3). Bogan does not accuse the other General Agents or NML itself of violating § 1.

In response, Hodgkins contends, first, that the Metropolitan Policy is exempt from the antitrust laws under the McCarran–Ferguson Act; second, that he cannot conspire with other NML General Agents; and third, that the Metropolitan Policy was not a violation of § 1 but merely a perfectly legal mechanism which NML and the General Agents use to protect their investment in the train-

---

**6.** The copy of the Metropolitan Policy submitted as Exh. V is very poor. This Court has attempted to transcribe it as accurately as possible. It states, in relevant part, that:

> Transfers within a metropolitan area are a touchy subject. Our first objective is to operate in the best interests of the Company and its General Agency system. Second, we seek reasonable solutions consistent with applicable federal and state law involving trade and commerce. In addition, we want to minimize Home Office interference in the conduct of local business because we feel it is contrary to the spirit of the General Agency System. However, the Company and the General Agents have to protect investments of time, energy and money in the recruitment, training, development and support of agents and in the General Agency system. Therefore, we need to operate within certain guidelines to provide a modicum of structure and some basic "rules of the road" with reference to transfers, especially in areas where several Agencies operate within the same territory.
>
> Our policy on operating General Agencies in metropolitan areas, as it relates to transfers, is as follows:
>
> 1. *Active, contracted Agents* residing within shared territory *shall not transfer between General Agencies without the approval of both General Agents.* (This includes proposed transfers where a change in contract to include manage-

ment or specialist responsibilities is involved.)

> . . .
>
> 3. *Agents who are "terminated"* by a General Agency *will not automatically be prevented from contracting with another General Agency unless the reasons for termination involved failure to comply with company rules or ethical practices or to meet other standards for holding a Northwestern Mutual Contract.*

Bog.Exh. V (emphasis added).

**7.** As a preliminary matter, we assume that Bogan has standing to bring an antitrust claim here. As a prominent commentator has noted, most courts have concluded that "employees may challenge antitrust violations that are premised on restraining the employment market but not violations premised on restraining competition in the downstream product market in which their employers sell." AREEDA, ANTITRUST LAW, ¶ 377a, p. 311. *But see Balaklaw v. Lovell*, 14 F.3d 793, 800 (2d Cir.1994). *Balaklaw* held that a doctor excluded by a hospital did not have standing under the antitrust laws because he had not shown anticompetitive effects in the relevant market. Since the question of the proper market is central to the analysis of the underlying antitrust claims, rather than summarily dismissing this case without analysis of the merits of those claims, we reserve consideration of this matter for our discussion of the § 1 conspiracy claim.

ing of their agents. Hodgkins further states that after he fired Bogan, the Policy's restrictions on transfer did not apply to Bogan because Bogan was no longer an active agent, that he justifiably terminated Bogan for cause, and at that point it was NML, not he, who exercised control over Bogan's ability to recontract. We consider these contentions separately in the order listed.

### B. *Antitrust Exemption under the McCarran–Ferguson Act*

■ According to the Supreme Court, the primary purpose of the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.,*[8] was to insure the continued regulation of the insurance industry by the states; its secondary purpose was to allow only a *limited exemption from the antitrust laws.* *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 218 n. 18, 221, 99 S.Ct. 1067, 1077 n. 18, 1078, 59 L.Ed.2d 261 (1979) (emphasis added) (The McCarran–Ferguson Act was designed primarily to enable insurers to collaborate on cooperative rate making without violating the antitrust laws.). In order to determine whether the Sherman Act applies to particular conduct of an insurer, the Court has developed a three-pronged analysis for construing the McCarran–Ferguson Act: conduct that (a) constitutes the business of insurance (b) is regulated by state law, and (c) does not constitute a boycott, is exempt from the Sherman Act. *See Royal Drug Co.,* 440 U.S. at 207, 99 S.Ct. at 1071; *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982).

To determine whether a particular practice of an insurance company constitutes the "business of insurance," the Supreme Court has articulated a further three-part test: First, whether the practice has the effect of transferring or spreading a policy holder's

risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry. *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3008–09.

■ Our application of this test leads us to conclude that restrictions upon the transfer of subordinate agents does not constitute the business of insurance, and that the McCarran–Ferguson Act therefore does not bar Bogan's claims. The basic purpose of the Act was to allow insurance companies to coordinate their policy structures to facilitate spreading their risks. We do not see how the Metropolitan Policy meaningfully furthers this goal. NML's proffered justification—that transfer restrictions result in increased training and thus better qualified NML Sales Agents—is evidence of a procompetitive advantage of the Policy. We are not convinced by Hodgkins' argument that this training serves the purposes of the McCarran Ferguson–Act and satisfies the *Pireno* test (promoting the spreading of risks and constituting an integral part of the contract between the insurer and the insured). Moreover, Hodgkins has not adequately established that the Metropolitan Policy is a matter regulated by state law. Thus, we deny Hodgkins' motion insofar as it contends that Bogan's claim is barred by the McCarran–Ferguson Act and proceed to a consideration of the merits of the claim under the Sherman Act.

### C. *The Ability of General Agents to Conspire*

■ A violation of § 1 requires concerted action among two or more persons; § 1 does not proscribe independent action. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752,

---

**8.** Section 1012 of the McCarran–Ferguson Act provides in relevant part:

(a) The *business of insurance,* and every person engaged therein, *shall be subject to the laws of the several States* which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any state for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance; *Provided, That* after June 30, 1948, *the Act* of July 2, 1890, as amended, *known as the Sherman Act, and the Act* of October 15, 1914 *known as the Clayton Act,* and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, *shall be applicable to the business of insurance to the extent that such business is not regulated by State law.* 15 U.S.C. § 1012 (emphasis added).

104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Schwimmer v. Sony Corp. of Am.*, 677 F.2d 946, 952 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). Hodgkins urges that *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), establishes that the General Agents are parts of a single corporate entity and cannot conspire as a matter of law. In that case, the Supreme Court held that a parent could not conspire with its wholly owned subsidiary. The Court explained that "A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id.* at 771, 104 S.Ct. at 2741.

The *Copperweld* Court provided an important limitation to its decision, however, cautioning that: "We limit our inquiry to the narrow issue squarely presented: whether a *parent* and its *wholly owned subsidiary* are capable of conspiring in violation of § 1 of the Sherman Act. We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." *Id.* at 767, 104 S.Ct. at 2739 (emphasis added). In this case, the General Agents are not wholly owned subsidiaries of NML. Indeed, NML has no ownership interest in the General or District Agencies, S.Bog.Aff. ¶ 16., and NML is not charged with participating in the conspiracy. Thus, *Copperweld* is not controlling.

■ Similarly, the Second Circuit has said that "collaborative action between a corporation and its employees, *or among employees within a corporation,* is not regarded as joint action within the meaning of § 1." *Schwimmer,* 677 F.2d at 953 (emphasis added). However, a corporation's wholesalers or dealers are capable of conspiring in violation of § 1. *Id.; see also United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (franchised auto dealers capable of conspiring with their franchisor); *Bowen v. New York News,* 522 F.2d 1242, 1256 (2d Cir.1975) (newspaper publisher guilty of formulating a § 1 conspiracy with its exclusive franchised dealers to restrict the sale of newspapers to independent resale dealers); *Borger v. Yamaha Intern. Corp.*, 625 F.2d 390, 395 (2d Cir.1980). In addition, it is clear that, outside of baseball, sports organizations are capable of conspiring with their member clubs in violation of the antitrust laws. *See, e.g., Mackey v. NFL,* 543 F.2d 606, 618–19 (8th Cir.1976), *cert. dism'd,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977)[9]; *Chicago Prof'l Sports Lim. Partnership v. N.B.A.,* 961 F.2d 667 (7th Cir.1992). Thus, in order to determine whether NML General Agents are capable of conspiring, it is important to determine whether they are more like employees or independent franchisees.

Some of the factors that suggested to the Second Circuit in *Bowen* that the dealer-franchisees were independent operators were: that they were labeled as "independent contractors" in their contract with the newspaper; that they had sole discretion to hire, discharge and supervise those engaged by them to carry out their delivery function; that they had sole discretion to determine the manner in which collections and deliveries were to be made; and that they had no right to return unsold copies. In addition, subscribers were considered to belong to the franchisees, and the newspaper had the right to buy a franchisee's customer list only if it were terminated. *Id.* at 1252–53. Thus, the

---

9. This case and *Smith v. Pro Football,* 593 F.2d 1173 (D.C.Cir.1978), were criticized by the Second Circuit as being inconsistent with its ruling in *Wood v. Nat'l Basketball Ass'n,* 809 F.2d 954 (2d Cir.1987). *See U.S. Football v. N.F.L.,* 842 F.2d 1335, 1372 (2d Cir.1988). *Wood* held that a basketball player's claim that certain practices of the NBA teams were a *per se* violation of § 1 was preempted by the collective bargaining provisions of labor law. *Wood,* 809 F.2d at 958–62 (challenging salary cap, college draft and prohibition of player corporations arrived at through collective bargaining.) *Smith* ruled that the labor laws do not preempt a challenge to the NFL draft under the antitrust laws. *Smith,* 593 F.2d at 1179 n. 22. *Mackey* ruled that a challenge to an NFL league rule regarding compensation of free agent's former club by new owners was not preempted by the labor laws because it was not the product of bona fide arm's length bargaining. *Mackey,* 543 F.2d at 615. It appears that all that the *Wood* court intended to criticize were the portions of the *Smith* and *Mackey* decisions which ruled that there was no preemption.

court found that the newspaper had intended to "cast some risk, although relatively slight, on the franchise dealer." *Id.* at n. 8.

In *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979), the Second Circuit discussed the important factors in determining whether a corporation is legally capable of conspiring with its agents.[10] As the Second Circuit explained:

> Whether ... two actors constitute distinct economic entities for purposes of the Sherman Act is determined by the economic realities of their relationship. In the context of the principal/agent relationship this analysis requires consideration of a number of elements which include: whether the agent performs a function on behalf of his principal other than securing an offer from a buyer for the principal's product; the degree to which the agent is authorized to exercise his discretion concerning price and terms under which the principal's product is to be sold; and finally, whether use of the agent constitutes a separate step in the vertical distribution of the principal's product.

*Id.* at 1031 (citations omitted). Since the plaintiffs acted "solely as conduit[s]" through which Amstar would negotiate the initial distribution of its sugar, they never purchased the sugar or competed with Amstar in its distribution or sale, Amstar never held them out as competitors, and the terms of the resultant sale were exclusively determined by Amstar, "rather than representing a separate and independent step in the distribution process, the sugar broker was merely an agent." *Id.* at n. 5. *See also Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir.1993) ("Jack-in-the-Box franchisor incapable of conspiring with franchisee to implement no-transfer agreement because they are part of a common enterprise.").

However, the Second Circuit has found members of a physician's group capable of conspiring under § 1. *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc.*, 996 F.2d 537, 545 (2d Cir.1993) (noting that the doctors were not staff physicians of the HMO *nor its agents,* but independent practitioners with separate economic interests). In finding that a parent and its wholly owned subsidiary are incapable of conspiring, the Southern District of New York noted that a "single corporation and *its agents and employees* are normally treated as a single actor for antitrust purposes except *where the individuals or subentities are held out as competitors.*" *Reborn Enter., Inc. v. Fine Child, Inc.*, 590 F.Supp. 1423, 1437 (S.D.N.Y.1984) (emphasis added), citing R. GIVENS, ANTITRUST: AN ECONOMIC APPROACH § 16.03, at 16–11 (1984).

Bogan's relationship with Hodgkins and NML has some similarities to that of the franchised newspapers dealers in *Bowen.* Bogan's District Agency contract itself recites that he "shall be an independent contractor and nothing herein shall be construed to make District Agent an employee of the Company or General Agent." *See* Hdgk. Exh. A. The contract goes on to state the "District Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of District Agent." *Id.* While all Agents selected by a District Agent must be approved by NML, the District Agent is responsible for all "expenses, costs causes of action and damages resulting from or growing out of acts or transactions by himself, his employees his agents or persons appointed by him." *Id.* Thus, according to the terms of the contract at least, while he does not have absolute control over hiring and firing, a District Agent certainly bears more than a "relatively slight" risk. *Id.*[11] If a District

---

10. This discussion was not essential to the holding in *Fuchs.* Relying upon the insufficiency of evidence of a conspiracy, the *Fuchs* Court found that a Sugar refiner and its general (non-exclusive) brokers were not guilty of a § 1 conspiracy in restraint of trade because in eliminating the general dealers (in favor of exclusive dealers), the refiner had acted unilaterally. *Id.* at 1031.

11. It is not clear, however, that the contract should be taken at face value. Both parties, at various times, urge that the contract is not repre-

Agent's position in the Company has aspects that are independent from NML's control, certainly his General Agent would enjoy at least as great a degree of independence, since a District Agent works under the supervision of his General Agent.

Bogan argues that General Agents cannot be considered à part of a single entity because they compete against each other to sell policies and for the services of the best subordinate agents in order to maximize their personal wealth. We agree for several reasons. First, although it appears that, like the sales agents in *Fuchs*, the General Agents of NML do not exercise discretion concerning the prices and terms of the policies their subordinate agents sell because NML establishes standard policy coverage and rate structures, Bogan argues that General Agents can compete for the sale of policies by permitting their District and Soliciting Agents to vary the level of service to and advocacy for the client. As he describes it, an Agent who puts the client first can offer not only superior services but a ·superior product. For example, the Agent can "do his best to obtain a non-rated policy or present[ ] the best policy alternative to the client so that the interests of the client and not the carrier are best served." Bog.Br. p. 27. One ·example of such a policy alternative

offered by Bogan is an Agent's decision to recommend a particular combination of "whole life" versus "term life" coverage. According to Jeffrey Grabel's testimony, whole life policies generally offer greater compensation to Agents. An agent who "puts the client first" might recommend a greater percentage of term-life coverage, even though such a recommendation is contrary to the Agent's—and his superiors'—pecuniary interests. Grabel Aff. ¶¶ 9–15. In view of the important role agents play in the structuring and servicing of policies, we find that the General Agencies constitute a "separate step" in the vertical distribution of NML's product.

Second, although the commissions paid to Agents are fixed by NML, General Agents allegedly compete for District and Soliciting Agents by varying the amount of training the agents receive, as well as the percentage of rent, supplies and secretarial services for which they are reimbursed. R. Bogan Aff. ¶ 8.

We therefore conclude that the General Agents exercise sufficient independent control over their agencies, have adverse interests and compete among themselves to a sufficient degree to render them legally capable of conspiring against each other.[12]

---

sentative of the actual relationship between the parties. Although Bogan strenuously urges that the General Agents are not one entity with NML, at another point he contends that "NML has treated all agents as agents of NML and it regularly controls their conduct by various means, up to and including directing or threatening their termination." (Pl.Br. p. 3, Bog.Aff. ¶¶ 24–34). Hodgkins, likewise, while insisting that NML and its various agents should be treated as one entity, allegedly has "repeatedly stated" that NML does not control the agents and that they are free to run their own businesses. Tamscin Aff. ¶ 16; S.Bog.Aff. ¶ 16.

12. Hodgkins urges that this court should follow the Tenth Circuit's lead in *Card v. Nat'l Life*, 603 F.2d 828 (10th Cir.1979), affirming a summary judgment for an insurer accused of conspiring with its General Agents to establish and enforce an exclusive agency agreement. There, the General Agents of National Life formed a corporation known as the General Agents Association, which was owned, controlled and financed by National Life General Agents. The General Agents met with officers of National Life and consulted with them on all major policy decisions. *Id.* at 830. ("According to Tamscin, the

General Agents of NML also had an "independent" organization, with its own officers and management, to "handle matters of interest to their members and represent their members' interests in matters pertaining to their relationship with NML." *Tamscin Aff.* (Scott Bogan) ¶ 8.)

The Tenth Circuit found this Association, as well as individual general agents to be "really part of the National Life Structure" and thus incapable of being regarded as conspirators. *Id.* at 834. *See also Pa. Indep. Bus. Assoc. v. Unicorn Mktg.*, 1985 WL 2812 at * 3–4 (E.D.Pa.) (If a corporation and its independent and separately incorporated subsidiary cannot form an antitrust conspiracy because the required 'different interests' do not exist, thén it is highly unlikely that a corporation can conspire with its agents ... An agent's interests ultimately coincide with those of the corporation and do not constitute the different interest required for concerted action under the antitrust laws.")

However, in addition to having very little solid information as to what the role of the NML General Agents' association was in the formation of NML company policy, we do not believe the exclusive agency agreement at issue in *Card* to be

### D. *The Applicable Antitrust Analysis*

Hodgkins further argues that even if the Metropolitan Policy was an agreement among the General Agents to restrict transfer of subordinate agents, it was not illegal because, in order to establish a violation of the antitrust laws, Bogan must show anticompetitive effect on the (consumer) market under the rule of reason. Bogan counters that the alleged conspiracy should be considered the type of group boycott that is *per se* illegal, or in the alternative should be analyzed under the "quick look" rule of reason. In resolving these issues we must first determine the proper characterization of the Metropolitan Policy under the Sherman Act, and correspondingly, the proper legal standard to apply to this conduct.

Although § 1 of the Sherman Act prohibits any contract, combination, or conspiracy in restraint of trade or commerce among the several states, 15 U.S.C.A. § 1, it has long been established that § 1 proscribes only unreasonable restraints. *K.M.B. Warehouse Distrib. v. Walker Mfg.*, 1994 WL 250115 (S.D.N.Y.), *aff'd*, 61 F.3d 123 (2d Cir.1995), (citing *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)). The Supreme Court has stated, that "[s]ince the early years of this century a judicial gloss on this statutory language has established the 'rule of reason' as the prevailing standard of analysis." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Certain business practices are deemed illegal *per se*, however, "because of their pernicious effect on competition and lack of any redeeming virtue." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). These practices and agreements are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.* Some examples of *per se* illegal arrangements are certain boycotts, horizontal territorial restrictions, and both horizontal and vertical price-fixing schemes. *See Capital*

*Imaging,* 996 F.2d at 537–38; *U.S. v. Topco Assoc., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 211–12, 79 S.Ct. 705, 708–10, 3 L.Ed.2d 741 (1959); *K.M.B. Warehouse,* 1994 WL 250115 at *3.

It is difficult to determine the exact nature of the conspiracy alleged by Bogan and the appropriate label to give it for the purposes of legal analysis, in particular to determine whether such an agreement would constitute a vertical or horizontal restriction on trade. Bogan would have us conclude that it is a horizontal agreement (among the General Agents) to allocate the market for the services of NML agents enforced by a group boycott that is illegal *per se.* As the Second Circuit has noted, the definition of a group boycott that is *per se* illegal is rather elusive and the cases discussing the issue are "fraught with uncertainty and doubt." *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1372 (2d Cir.1988), (*comparing Klor's,* 359 U.S. at 212, 79 S.Ct. at 709 (" '[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden [*per se* ] category.' "), *with Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 30–31, 104 S.Ct. 1551, 1567–68, 80 L.Ed.2d 2 (1984) ("exclusion of physician from hospital staff privileges not violation of antitrust laws '[w]ithout a showing of actual adverse effect on competition' in product market"), *and Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 296, 105 S.Ct. 2613, 2620–21, 86 L.Ed.2d 202 (1985) ("group boycott was not *per se* illegal absent proof that buying cooperative possessed market power.")).

While the case law is difficult to parse, the Court of Appeals for the District of Columbia has provided some helpful instruction on the matter. It stated that: "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from **non-group** members who seek to compete at that lev-

---

analogous to the no-transfer agreement at issue here. In *Card,* all General Agents had the *same* interest in disallowing the writing of outside business by their subordinate agents—the loss of

prospective commissions. Here, the General Agents have competing interests in recruiting the most productive agents from other General Agencies. Therefore, we do not find *Card* compelling.

el.... *It is this purpose to exclude competition that has characterized the Supreme Court's decisions invoking the group boycott per se rule.*" *Smith v. Pro Football*[13], 593 F.2d 1173 (D.C.Cir.1978) (bold emphasis added), *cited in Topps Chewing Gum v. Major League Baseball Players,* 641 F.Supp. 1179, 1186–87 (S.D.N.Y.1986). Like other types of conduct found illegal *per se,* these classic group boycotts "involve a type of arrangement that is so clearly and consistently anticompetitive that it is inherently illegal." *Topps,* 641 F.Supp. at 1187–88.

This definition does not seem to fit squarely the situation in this case. Though the General Agents occupy the same level in the market and we have assumed that they have sufficient independence to conspire and that they do compete to a certain extent, *see* section II(C), *supra,* it seems illogical for Bogan to claim that the General Agents have conspired to exclude *themselves* from a most attractive part of the market for labor. Bogan has not alleged that a subset of General Agents are excluding others, or that they are excluding non-NML agents. The Metropolitan Agreement purportedly prevents other General Agents from recontracting with an agent terminated for cause, thus excluding not only subordinate agents, but the General Agents themselves from the excluded agent's continued commissions. In this scenario,

there is no classic outsider at the same level being excluded unless the General Agents are excluding themselves—Bogan does not occupy the same level as the General Agents. Thus, Bogan's claim, if styled as a group boycott, approaches the type of implausible assertion frowned upon in *Apex Oil, supra.*[14]

In addition, NML does not appear to possess the requisite market power required by the Supreme Court in *Northwest Wholesale Stationers, supra,* before a boycott will be found *per se* illegal. According to Hodgkins, NML "holds only 4% of the relevant insurance market." Hdgk.Br. p. 30. Nowhere does Bogan challenge this assertion or suggest that NML has market power in the insurance market.

Furthermore, although Bogan has alleged that only the General Agents were involved in any conspiracy to restrict transfer, the evidence presented to this Court makes it apparent, however, that NML played an indispensable (if not unilateral) role in enforcing the Metropolitan Agreement. Bogan himself testifies "In the Metropolitan New York Area, the General Agents and Northwestern Mutual have entered into a separate agreement strictly limiting the ability of any soliciting agent to transfer from one General Agency to another." Bog.Aff. in Opp. to Hdgk. Motion for Order to Surrender Documents ¶ 4, NML Exh. 22.

---

**13.** Recall from fn. 9 that this case and *Mackey v. Nat'l Football League,* 543 F.2d 606 (8th Cir. 1976), *cert. dism'd,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), were criticized by the Second Circuit, likely on the issue of labor law preemption of the antitrust laws.

**14.** In making this statement, we do not mean to suggest that we are convinced that Hodgkins' proffered justification for firing Bogan was not pretextual and that the Metropolitan Policy did not provide some assistance to Hodgkins in his efforts to end Bogan's relationship with NML. Although Hodgkins offered considerable evidence that some of Bogan's subordinates considered him a difficult and "dictatorial" supervisor, the facts as Bogan presents them paint a picture that he was highly successful and that he was drummed out by Hodgkins, who conditioned his further employment on his allowing his Soliciting Agents to break their exclusive agency contracts with NML. Bogan suggests this was a mere pretext for taking over his agency. Hodgkins counters that he fired Hodgkins for legitimate reasons—causing unrest in the office and refusing to turn over Slocum and Wintrich's rec-

ords—and that the absence of a conspiracy is shown by the fact that another General Agent *did* agree to contract with Bogan. Hodgkins adds that it was NML (not Hodgkins) that disapproved of the Bogan's proposed contract with another General Agent, that NML was perfectly justified in doing so, and that Bogan's failure to sue NML itself for antitrust violations is instructive. While these facts provide evidence that there was no such conspiracy, they do not establish that conclusion as a matter of law. A reasonable jury might find that through the Metropolitan Policy, Hodgkins and NML used coercion aimed at getting Bogan to "go along" with Hodgkins' alleged policy of "don't ask, don't tell" with respect to the Soliciting Agents' violations of their exclusive agency contracts, that Bogan was not justly fired for cause, and that the Metropolitan Policy that facilitated his permanent termination could be considered a "boycott." All this being said, we still cannot conclude that the challenged pattern of behavior constitutes the type of boycott that is illegal *per se.*

It certainly appears that NML enforced any such General Agent agreement. For example, prominent NML officers sided with Hodgkins in his dispute with Bogan. *See e.g.,* tape of 6/1/90 conversation between NML Vice President Dennis Tamscin and Robert Bogan, Hdgk.Exh. J., ("You must give Brud [Hodgkins] access to any records in the District Agency ..."). Tamscin, however, asserts that NML by no means encouraged or even tolerated violations of the exclusive agency agreements, and did not encourage Hodgkins to send Bogan the 30-day notice, but merely "agree[d] with Hodgkins that Bogan's continued refusal to turn over the agents' records justified his termination for cause and NML tried as best it could to persuade Bogan to release the records to avoid termination for cause." Tamscin Reply Aff. ¶ 19.

In addition, the parties do not dispute that Bogan had actually signed a preliminary Special Agent's contract with another General Agent (Gerald Gilberg) and that it was NML that disapproved the contract after Bogan was terminated for cause. *See* Hdgk.Exh. N, G. Gilbert Depo. p. 114. There is no evidence that any other General Agents were involved in this particular decision, other than their alleged agreement to the Metropolitan Policy concerning such matters. These facts cut against Bogan's argument that the General Agents were part of an organized conspiracy to restrict transfer, but cannot defeat the assertion as a matter of law. It certainly appears likely that at least in this instance, without the enforcement arm of NML, any such conspiracy among the General Agents would have failed.

Tamscin also avers that it was NML itself who wanted the policy in the first place. Tamscin Aff. ¶ 37 ("NML has traditionally encouraged its General Agents to try to reach agreement as to the circumstances under which they would approve transfers within their territories. NML not only encouraged such agreements, but typically drafted the agreements and met with the General Agents involved in order to help resolve any differences among them in order to reach an agreement that would be acceptable to them

and NML"). A 1989 letter from Kent Beebe to Hodgkins states that:

> ... the Company has developed its policies regarding transfers and recontracting in order to foster orderly development of all general agency territories, especially those in major metropolitan areas. As you know, the Company as a general rule does not allow transfers between metropolitan agencies. Prohibiting transfers protects each general agent's investment of time, energy and money in the recruitment, financial support and development of agents ...

G. Gilberg Exh. A.

Tamscin states that the General Agents never agreed to the policy (NML's efforts were "singularly unsuccessful"), and that Mr. Beebe of NML then sent out a copy of the document Bogan calls the Metropolitan Policy as part of a memorandum sent to all General Agents. Tamscin Aff. ¶ 38; G. Gilbert Depo p. 334; *see also Hdgk.* reply Aff. ¶ 4. The memo reads, in part:

> While it is pretty obvious that we will not all agree on each and every subject, the opportunity to constructively share concerns, values and ideas is always valuable.
>
> Since our meeting we have been conferring with the Law Department about the transfer rules we discussed. They have advised us of the state of the law on a number of issues implicit in our efforts to legitimately control transfers in the best interests of the Company and its general agents. We are convinced that the most effective control is a Company policy which addresses your concerns without placing unfair or unreasonable restraints on agents or former agents.
>
> Therefore, the principles which we discussed have been revised with the help of counsel and are set forth in the attached Company Policy on New York Metropolitan Transfers ...
>
> I want to stress once again the ultimate objective which is the development of such strong metropolitan relationships that you are able to handle your situations and difficulties without Home Office intervention. We continue to believe that the existence

of excellent relationships among our General Agents sharing the New York Territory is the paramount issue, because with good relationships and a desire to "do the right thing" most disputes will disappear. G. Gilberg Depo.Exh. B, S. Gilbert Depo. Exh. A.

At minimum, these facts suggest strong vertical aspects to the alleged combination or conspiracy.[15] Bogan's decision not to assert an antitrust claim against NML does not change this reality. Thus, Bogan's characterization of the Metropolitan Policy as the type of *per se* illegal boycott quintessentially entered into by horizontal competitors to exclude outsiders is highly dubious.

Nor does this case involve a horizontal conspiracy affecting prices. The Supreme Court has found franchised auto dealers liable under the *per se* rule for conspiring with their franchisor to restrict price competition. *See United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In *General Motors,* a number of exclusive dealers, each of whom GM had franchised to sell its cars in a different Los Angeles location, began reselling GM cars to discount houses that then resold to consumers. Other franchise dealers complained to GM, who reacted by obtaining an agreement from each not to resell to discounters. Three associations of franchise dealers jointly policed the agreements by supplying information to GM who met with the dealers to discourage the practice and to request that the cars sold to discount houses be repurchased. *Id.* at 129–38, 86 S.Ct. at 1322–27.

In defense of its practices, GM argued that the resales violated the "location clause" in its franchise agreements. The Supreme Court did not question the legality of such agreements, or that GM itself might have taken unilateral action to enforce them. However, it stated:

> We have a classic combination in restraint of trade: joint, collaborative action by dealers, the ... associations, and General Motors to eliminate a class of competitors by terminating dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose. Against this fact of unlawful combination, the "location clause" is of no avail. Whatever General Motors might or might not have done to enforce individual dealer Agreements by action within the borders of those agreements and the relationship which each defines, is beside the point.

*Id.* at 140, 86 S.Ct. at 1327–28. The Court was careful to point out, however, that "inherent in the success of the combination in this case was a substantial restraint upon *price competition*—a goal unlawful *per se* when sought to be effected by combination or conspiracy." *Id.* at 147, 86 S.Ct. at 1331 (emphasis added).

■ Bogan argues that the Metropolitan Agreement significantly affects price competition. We disagree. The "price" that Bogan asserts is affected by the Metropolitan Agreement's limitation on transfer is the total compensation provided to NML District, Sales and Soliciting Agents. While Bogan concedes that an NML Agent's commissions are fixed regardless of who his supervising agents are, he asserts that General Agents have significant discretion in the amount they reimburse their subordinate agents for rent, secretarial services, and supplies and that this discretion would create "wage" competition if the subordinate agents were permitted to transfer between general agencies. Bog. Aff. ¶ 8; *see* section II(C), *supra.* While this may well be the case, it does not help Bogan here because, as discussed below, his definition of the relevant market as consisting only of the services of NML agents is unacceptable. The market is properly considered the entire industry (or at least the New York Metropolitan area), and thus any restriction on wage competition in NML's small share of the industry does not seriously affect such

---

15. There are countless cases discussing whether to denominate similar agreements as vertical or horizontal conspiracies. Many find such arrangements to be vertical. *See, e.g., Blanton Enter., Inc. v. Burger King Corp.,* 680 F.Supp. 753, 765 (D.S.C.1988) (refusal by Burger King of franchise to plaintiff was vertical restraint, despite complaints of franchisees). We believe, however, that the best characterization of the Metropolitan Agreement is that it was both vertical and horizontal in nature.

competition in the industry as a whole.[16] Thus, the Metropolitan Policy cannot be considered a restriction on price competition that would fall under the *per se* analysis.

In a situation the Second Circuit found to be "remarkably similar" to that condemned in *General Motors*, the court found a newspaper publisher guilty of formulating a § 1 conspiracy with its exclusive franchised dealers to establish exclusive territories. *Bowen v. New York News*, 522 F.2d 1242, 1256–58 (2d Cir.1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). The obvious effect of the agreement was to prevent competition in the sale of newspapers to independent resale dealers. *Id.* The territorial restriction was apparently held illegal *per se*, since the Second Circuit did not discuss whether it was performing a *per se* or rule of reason analysis, but simply held the conspiracy illegal, without express consideration of market power or effects on competition. *Id.* Here, however, the alleged conspiracy (the Metropolitan Policy) does not involve the establishment of exclusive territories—in fact, Bogan complains about a restriction against his transfer within a territory shared by six General Agents. Bog. 3(g) stmt. ¶ 34.

In light of the fact that the Metropolitan Policy cannot be considered either a classic group boycott, a horizontal price-fixing scheme or a horizontal territorial allocation that is illegal *per se*, we turn to an analysis of cases involving similar facts—those involving arrangements that are both horizontal and vertical in nature—in order to determine whether an agreement among General Agents that is policed by their principal, such as the Metropolitan Policy, constitutes a violation of the antitrust laws.

Many courts have held that sports organizations (outside of baseball) are capable of conspiring with their member clubs in violation of the antitrust laws and have analyzed these conspiracies under the rule of reason. *See, e.g., Mackey v. NFL*,[17] 543 F.2d 606, 618–19 (8th Cir.1976), *cert. dism'd*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). In *Mackey*, the Eighth Circuit held that a NFL rule that required a club acquiring a free agent to compensate the agent's previous club constituted a group boycott properly analyzed under the rule of reason because of the special circumstance that the NFL possessed some characteristics of a joint venture and some characteristics of competition. *See also Chicago Prof'l Sports Lim. Partnership v. N.B.A.*, 961 F.2d 667, 673 (7th Cir.), *cert. denied*, 506 U.S. 954, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992) (Rule of reason properly applied to NBA rule limiting television broadcasts since NBA is a joint venture); *Brenner v. World Boxing Council*[18], 675 F.2d 445, 454–55 (2d Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (declining to apply *per se* rule to World Boxing Council suspension practices).

The Second Circuit has found that an agreement by independent magazine solicitors to prevent its agents from switching agencies was an agreement "ostensibly directed at 'housecleaning' within the ranks of the signatory organizations themselves" and that "[b]ecause a harmful effect upon competition is not clearly apparent from the terms of these agreements," they were "distinguishable from those boycotts held illegal *per se*." *Union Circulation Co. v. Fed. Trade Comm'n*, 241 F.2d 652, 657 (2d Cir.1957).

More recently, in *K.M.B. Warehouse v. Walker Mfg.*, 61 F.3d 123, 127 (2d Cir.1995), the Second Circuit found a conspiracy be-

---

**16.** Bogan argues that even if agent services are not considered a market, the Sherman Act protects the benefits of competition in "vital matters such as claim policy and quality of service." Bog.Br. p. 27 (citations omitted). While he is certainly correct about the law, he is still incorrect in defining the proper market—it is not simply *NML* claim policies and the quality of service available to NML customers that is protected, but policies and level of service in the *entire industry, or at least the New York Metropolitan area.*

**17.** Recall from fn. 9 that this case has been criticized by the Second Circuit, likely on the issue of labor law preemption of the antitrust laws.

**18.** The Court noted that "absent a facial showing of anticompetitive purpose underlying the adopting or enforcement of a rule, the disciplinary activity of a sports organization must be evaluated under the *Denver Rockets* test or the rule of reason." *Id.* at 455 (referring to *Denver Rockets v. All–Pro Management, Inc.*, 325 F.Supp. 1049, 1064–65 (C.D.Cal.1971)).

tween an auto parts manufacturer and some of its distributors to exclude an outside auto-parts distributor to be a vertical, non-price restriction governed by the rule of reason. The manufacturer, at the behest of some of its distributors, refused to honor a contract it had made with K.M.B. to allow K.M.B. to distribute it products. *Id.* at 126; *see also Bunch v. Artec Intern. Corp.*, 559 F.Supp. 961, 966 (S.D.N.Y.1983) ("[M]erely because a dealer's termination may contain elements of a horizontal restriction, it does not become a *per se* violation of the Sherman Act, thereby obviating the requirements that plaintiff's establish that defendants' conduct is manifestly anticompetitive.").

The Second Circuit has also recently stated that an arrangement that had both horizontal and vertical aspects definitely should be tested under the rule of reason and "possibly under the *per se* rule applied to group boycotts in *Klor's*, if the restraint of trade 'has no purpose except stifling competition.'" *Discon, Inc. v. NYNEX*, 93 F.3d 1055, 1060–61 (2d Cir.1996). There, plaintiff Discon accused NYNEX and MECo, (a corporation that acted as NYNEX's procurement agent), of conspiring to exclude Discon from providing "removal" services. (These removal services included salvaging and disposing of obsolete telephone central office equipment.) The court found that plaintiffs had not established a horizontal restraint because MECo did not itself provide removal services and thus did not compete with Discon or NYNEX. *Id.* However, the Second Circuit stated that an agreement between two firms, even in a vertical relationship may constitute a horizontal restraint if it seeks to "disadvantage a direct competitor." It found that in Discon's case, no pro-competitive justification appeared on the face of the complaint for NYNEX's behavior in excluding Discon and thus concluded that a cause of action had been stated, leaving the decision as to whether to apply the rule of reason or a *per se* analysis to the district court at trial. *Id.*

("*Per se* rule to be applied only if evidence shows that the practice had 'no purpose other than to stifle competition.'"); *see also Volvo N. Amer. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 72–73 (2d Cir.1988) (Whether conduct alleged to be possibly horizontal market division, group boycott or concerted refusal to deal is to be analyzed under rule of reason or *per se* test is "matter for the district court to decide in due course.").

The transfer restrictions of the Metropolitan Policy at issue here may well have been promulgated with mixed motives, one of which was a desire on the part of the General Agents to preserve the *status quo* at NML, thereby stabilizing the amount of compensation each General Agent expected to receive. However, at the inter-company level, the Policy appears to have the substantial procompetitive justification of encouraging General Agents to better train their subordinate agents.[19] This enables each General Agent to compete more effectively for clients with other NML General Agents and with the agents of other companies. (*see* section II(C), *supra*). It also enables them to better compete with other General Agents for the hiring of new subordinate agents, who have an obvious interest in receiving the best training possible. Thus, it is not the type of practice that has "no purpose except stifling competition."[20] *Discon*, 93 F.3d at 1061–61; *see also Northern P.R. Co.*, 356 U.S. at 5, 78 S.Ct. at 518 (In order to be illegal *per se*, a practice must be "so pernicious" as to "lack ... any redeeming value."). Therefore, regardless of the precise label given to the conduct, (boycott, a horizontal price-restraint with vertical aspects, vertical non-price restraint with horizontal aspects and price effects, etc.), we believe a careful comparison of the facts of this case and of the precedents in the Second Circuit shows that it is properly analyzed under the rule of reason. Accordingly, consistent with the sports cases, *K.M.B. Warehouse*, and the Second Circuit's

---

**19.** Bogan himself testifies in detail as to the importance and expense of training agents. *See, e.g.,* R.Bog.Aff. ¶ 16, ¶ 55 ("The recruiting, training and performance of Sales Agents determines 100 percent of management revenue.").

**20.** This is a further reason that the Metropolitan policy cannot be considered a "group boycott." *Topps Chewing Gum, supra,* 641 F.Supp. at 1186, suggests that such group boycotts must have a "pernicious effect on competition and lack any redeeming virtue."

prescription that "expansion of the *per se* rule 'should be approached with great caution,'" *Copy–Data Sys., Inc. v. Toshiba Am.,* 663 F.2d 405, 411 (2d Cir.1981), we next analyze the effects of the Metropolitan Policy under the rule of reason.

### E. *Rule of Reason Analysis of the Competitive Effects*

■ According to the Second Circuit:

Establishing a violation of the rule of reason involves three steps. "[P]laintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market...." If the plaintiff succeeds, the burden shifts to the defendant to establish the "procompetitive 'redeeming virtues'" of the action. Should the defendant carry this burden, the plaintiff must then show that the same procompetitive effect could be achieved through alternative means that is less restrictive of competition.

*K.M.B. Warehouse,* 61 F.3d at 127 (citations omitted); *Capital Imaging,* 996 F.2d at 543; *Int'l Distrib. Centers v. Walsh Trucking,* 812 F.2d 786, 793 (2d Cir.1987), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (plaintiff must show anticompetitive effects of the conspiracy outweigh the procompetitive.) [21]

### 1. *The Test for Proving Adverse Effect*

■ "The antitrust laws ... were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Thus, a plaintiff must show more than that he was harmed by defendant's conduct or that there was an adverse effect on competition among different sellers of the same product. *K.M.B. Warehouse,* 61 F.3d at 127. Such intrabrand restrictions can "actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product." *Id.* The focus of the inquiry must be the relevant market as a whole, and any restriction of intrabrand competition must be balanced against any increases in interbrand competition. *Id.; see also Borger v. Yamaha Intern. Corp.,* 625 F.2d 390, 397 (2d Cir.1980).

■ While Bogan has shown considerable personal harm from Hodgkins' and NML's conduct, he has not shown sufficient harm in the relevant market—labor of insurance agents in the metropolitan area.[22] Bogan would apparently have us believe the relevant market is his services, or that of only NML agents. As *K.M.B.* illustrates, this is not the proper market for antitrust purposes.[23] *See also Balaklaw v. Lovell,* 14 F.3d

---

**21.** Bogan would have us apply the "Quick Look" approach to the rule of reason, arguing that "Because these are restraints by horizontal competitors, as Hodgkins admits, the 'Quick Look' approach requires Hodgkins to justify the restraint by proving that procompetitive effects outweigh anticompetitive effects and are the least restrictive available." Hdgk.Br. p. 34. To justify the application of the "Quick Look" approach, he quotes the Seventh Circuit in *Chicago Pro Sports, Supra,* as stating that such an approach applies because "there was a 'naked restraint' of a horizontal nature because it was an agreement among competitors as to certain issues concerning how they would compete with each other." This quotation "cherry picks" a phrase from its context—the "naked restraint" must be one on *"price* or *output."* *See, e.g., Chicago Pro Sports,* 961 F.2d at 674. As discussed above, the conspiracy alleged here does not constitute a price restriction in the relevant market—that of the labor of agents industry-wide, or at least metropolitan-area-wide. Nor does it affect output. Bogan does not allege that it affects the number

of policies sold or agents hired. The Metropolitan Policy merely prevents *transfers of agents between NML General Agencies.*

**22.** Even though Bogan has since recontracted with Massachusetts Mutual and still apparently uses the same offices, he alleges that he lost a significant client base that did not transfer with him to Massachusetts Mutual as well as generous retirement benefits. *See* Bog.Aff. ¶¶ 12–13. We find these assertions credible, and thus sufficient to establish personal harm from his termination, although his subsequent contract with Massachusetts Mutual provides evidence that interbrand competition was increased by his termination.

**23.** Even if NML agents were the proper market (which we do not believe) there is no evidence before this court that anyone other than Robert (and perhaps Scott) Bogan was prohibited from transferring. In fact, Scott Bogan concedes in his deposition that Stephen Gilberg had stated in a June 11th meeting that the Metropolitan Policy "would not be an inhibition ... [to recontract-

793, 798–99 (2d Cir.1994) (No antitrust injury where anesthesiologist complained about exclusion from hospital holding exclusive contract with another association of doctors—plaintiff had failed to show injury either to consumers (patients) or sellers (doctors) in the relevant markets. The relevant market for the doctors was the multi-state area in which the hospital recruited doctors.).[24] While Bogan has offered several affidavits of customers and agents stating that they prefer not to have either their own or their client's personal information provided to anyone besides Robert Bogan, (*see, e.g.,* James Cantalini Aff., Michael Flora Aff., Lawrence Green Aff., Al Woodall Aff., Eric Wagoner Aff., Donald Zinn Aff.), the Second Circuit has found such "isolated statements of preference are not a sufficient 'empirical demonstration concerning the [adverse] effect of the [defendants'] arrangement on price or quality.'" *K.M.B.*, 61 F.3d at 128. Thus, since Bogan has not demonstrated the requisite evidence of adverse effect in the relevant market, he has failed the rule of reason test as a matter of law.[25]

### 2. The Tests for Procompetitive Effect and Plaintiff's Obligation to Prove Less Restrictive Means

Since we have held as a matter of law that Bogan has failed to satisfy the first prong of the rule of reason analysis, we need not reach the other elements. We note in passing, however, that Hodgkins has offered a procompetitive justification—the encouragement of training—that was supported by Bo-

gan's own affidavits. *See* fn. 19, *supra.* Moreover, Bogan has not offered a suggested any less restrictive means by which NML and the General Agents could insure that the District and Sales Agents receive adequate training.

## III. THE STATE CLAIMS

As previously mentioned, this case presents a federal antitrust claim together with fifteen pendent state claims which Bogan urges us to retain under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. The exercise of pendent (or supplemental) jurisdiction is left to the discretion of the district court. *Purgess v. Sharrock,* 33 F.3d 134, 138–39 (2d Cir.1994). In exercising its discretion, the district court is permitted to weigh several factors, including considerations of judicial economy, convenience, and fairness to litigants. *Id.* (state claims retained where federal claim was dismissed at the close of the evidence.)

First, we note that the pendent state claims are the subject of a pending action in Supreme Court, Westchester County. If we retain no part of this case and allow it to proceed in the state court, judicial economy and convenience of the parties would not be substantially disserved. True, this Court has spent considerable time familiarizing itself with the facts of the case, but we have done so mainly with an eye towards the federal claims at issue. We have not probed in depth the factual basis for the state claims

---

ing]" and that *"there have been transfers of agents previously between agencies;* and that it wasn't an issue. Nobody would be encumbered." S.Bog. Depo. p. 455 (emphasis added).

**24.** *Balaklaw* was actually decided on the basis of standing; the Second Circuit found that since plaintiff had not shown injury to competition in the relevant market, he had not demonstrated antitrust injury and had no standing. *Balaklaw,* 14 F.3d at 798–800. The court noted:

For standing purposes, however, whether there was or was·not a *per se* violation is irrelevant. Regardless of any substantive violation of the Sherman Act, sections 4 and 16 of the Clayton Act still require plaintiffs to establish that the defendants engaged in anticompetitive conduct that caused them an antitrust injury ... Although the *per se* rule relieves plaintiff of the

burden of demonstrating an anticompetitive effect, which is assumed, it does not excuse a plaintiff from showing that his injury was caused by the anticompetitive acts.

*Id.* (citations omitted.) Since we decide that for the same reasons, Bogan has failed the rule of reason test, we need not reach the standing issue.

**25.** Bogan strenuously urges that this situation is analogous to that of a professional sports player who is not allowed by the league to transfer between teams. While these cases have numerous similarities, the one fatal dissimilarity Bogan fails to perceive is that here, there are other insurance agencies for whom he could work. In fact, Bogan is apparently working for one now. Hdgk.Br. p. 7. When the NFL forbids a player to transfer without compensation of his prior team, *see Mackey, supra,* he is effectively prevented from playing elsewhere.

such as fraud and tortious interference with contract, and would be required to spend considerable time and effort to do so. Nor have we considered the lengthy submissions regarding Plaintiffs' claims against NML. Moreover, the state court is undoubtedly much more familiar with the state law principles applicable to all of these claims.

This Court, with the generous help of Magistrate Judge Fox, has expended significant resources to oversee the discovery process. This effort will not have been in vain should we dismiss the state claims, but will surely work to save the State Court and the parties considerable time and expense in their continued prosecution of this suit. The extensive discovery already undertaken should not have to be repeated. While Bogan urges us that he would be prejudiced by the 16–month delay in obtaining a trial date in state court, we do not consider this delay a significant factor. Our current trial calendar would not permit trial of the case for approximately ten months, even if the parties were ready for an immediate trial, which they are not. Moreover, there are pending motions by both defendants for summary judgment on all fifteen claims, another factor that could cause further substantial delay of the trial. Thus the time required to reach trial in the state court is not a significant factor in our decision whether to retain jurisdiction.

In light of the above factors, we decline to exercise supplemental jurisdiction over the Bogans' state law claims.

## CONCLUSION

Although we conclude that an agreement among an insurance company's General Agents to restrict the transfer of their subordinate agents does not constitute the business of insurance under the McCarran–Ferguson Act and that General Agents can conspire with each other, and thus that the conspiracy alleged by Bogan is not exempt from antitrust scrutiny, we conclude that the activity of Defendant Hodgkins alleged in the complaint does not constitute an antitrust violation. Because the alleged conspiracy appears to have at least some vertical aspects, to have occurred in a setting that requires at least some horizontal cooperation, and not to have involved naked price or output restraints, it is properly analyzed under the rule of reason. Since Bogan has failed to show sufficient adverse effect on the relevant market—the labor of subordinate insurance agents in the New York Metropolitan area—he has failed to satisfy the rule of reason test, and his antitrust claim fails as a matter of law. Finally, since neither judicial economy, convenience nor fairness to the litigants would be particularly served by our retaining supplemental jurisdiction over the fifteen state claims, we decline to do so. Thus, we grant defendants' motion for summary judgment on the antitrust claim, and dismiss the remaining fifteen state claims for resolution in the pending state court case.

SO ORDERED.